STEVEN GORDON AND SANDRA GORDON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gordon v. Commissioner
Docket No. 22215-84.
United States Tax Court
T.C. Memo 1988-9; 1988 Tax Ct. Memo LEXIS 9; 54 T.C.M. (CCH) 1484; T.C.M. (RIA) 88009; January 6, 1988; As amended January 6, 1988 *9 Held: Language of a series of restricted consents interpreted in respondent's favor. Paul J. Lane, for the petitioners. James W. Clark and Avery B. Counsins III, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax liability for the calendar years 1974, 1975, 1976, *10 and 1978 in the following amounts, respectively: $ 6,260, $ 3,132, $ 604, and $ 1,731. By motion for leave to amend answer, filed November 6, 1985, respondent claims additional interest under section 6621(d) [1] (redesignated section 6621(c)) and damages pursuant to section 6673. Respondent's motion was granted by the Court subject to petitioners' objections to the motion which were to be set forth in petitioners' brief. Due to petitioner's objections, the propriety of the late amendment to answer remains before the Court. In addition, petitioners contend that the years are barred by the statute of limitations, based upon their interpretation of certain language contained in Forms 872 and 872-A. Background
The sole issue raised by the notice of deficiency is the disallowance of Schedule F losses arising out of an investment by Steven Gordon (Gordon) in a cattle breeding program offered by Southern Star Land and Cattle Co., Inc. (Southern Star). This issue has been before *11 this Court in four cases: Cherin v. Commissioner, 89 T.C.     (Nov. 23, 1987); Hunter v. Commissioner,T.C. Memo 1982-126; Siegel v. Commissioner,T.C. Memo. 1985-441; and Jacobs v. Commissioner,T.C. Memo 1985-609. On September 3, 1985, we issued an order to petitioners to show cause why petitioners' case is not governed by our opinions in Hunter v. Commissioner, supra, and Siegel v. Commissioner, supra.Petitioners' response to the order to show cause as to the years 1974 and 1975 was that the statute of limitations had run. This was in effect a concession that their case is governed by Hunter and Siegel. As to the years 1976 and 1978 petitioners correctly claim that respondent's determinations are inconsistent with the theory of our holdings in Hunter and Siegel.
Respondent, in his response to the order to show cause, concedes that if we find for respondent on the cattle shelter issues and on the statute of limitations issue, petitioners are not taxable in 1976 on income from Southern Star, and petitioners received no income from discharge of indebtedness in 1978. *12 By Memorandum Sur Order dated October 18, 1985, we held that Gordon's Southern Star cattle investment is governed by our decisions in Hunter v. Commissioner, supra, and Siegel v. Commissioner, supra.
Respondent on September 23, 1985, filed a motion for partial summary judgment with respect to the statute of limitations issue. That issue involves the interpretation of the language of restricted consents to extensions of the statute of limitations contained in Forms 872 and 872-A. Petitioners filed a notice of objection to the motion. Both the motion and the objection have affidavits and various documents attached. By Memorandum Sur Order dated October 16, 1985, we decided the statute of limitations issue against petitioners based on the pleadings, the affidavits, and the attached documents. Petitioners on October 21, 1985, filed a document which we treated as a motion for reconsideration of our Memorandum Sur Order dated October 26, 1985. Petitioners asserted that we misconstrued certain statements in Gordon's affidavit attached to their Objection to the motion for partial summary judgment and requested that we vacate our October 16, 1985, order, *13 and permit them to have a trial on the merits of the statute of limitations issue. By order dated October 21, 1985, we vacated the October 16, 1985, order and set the motion for partial summary judgment for hearing on November 6, 1985. At the hearing, by consent of the parties, we treated as the record for purposes of this trial, the motion for partial summary judgment, its attached affidavit, and the exhibits attached thereto together with the testimony of the witnesses and the additional exhibits received in evidence. We also held the record open to receive a stipulation of facts which was filed on February 20, 1986. The stipulation includes an affidavit of Neil H. Levine which we are to treat as containing the substance of what his testimony would have been had he appeared and testified at the hearing. Petitioners object to two exhibits which are attached to the Levine affidavit. If such exhibits had been presented at the trial, petitioners would have had an opportunity to present testimony with respect thereto. Petitioners' objection is well taken. Accordingly we treat the affidavit of Neil H. Levine as testimony in the case but we exclude from our consideration Exhibits *14 T and U attached thereto. Petitioners contend that the statute of limitations pertaining to the years 1974 and 1975 was extended only with respect to Schedule F adjustments arising out of cattle breeding operations acquired from Southern Star and that their cattle were acquired from Cattle Management, Inc. (Management), which at the time was a wholly owned subsidiary of Southern Star. FINDINGS OF FACT At the time of filing of the petition in this case, petitioners were residents of Miami, Florida. Petitioners' Federal income tax returns for the years 1974 and 1975 show no tax return preparer; we therefore, conclude that petitioners (presumably Gordon) prepared those two income tax returns. This is consistent with the fact that Gordon represented petitioners in connection with the audit of these two returns by respondent until after the issuance of the 30-day letter at which time he employed a certified public accountant to file the protest. Both tax returns describe Gordon as a "corporation officer" and Mrs. Gordon as a "housewife." For the year 1974 petitioners reported salary income in amounts slightly more than $ 62,000, plus $ 16,000 in bonus and commission income. *15 In 1975, petitioners reported slightly more than $ 32,000 of salary income and $ 5,450 of bonus and commission income. On November 16, 1977, petitioners signed a Standard Form 872 extending the period for assessment of taxes for the calendar year 1974 through December 31, 1979. On September 6, 1978, one of respondent's agents sent to petitioners an unrestricted Form 872 to extend the statute of limitations for the years 1974 and 1975. Presumably this form was similar to that used to extend the year 1974 through December 31, 1979. On September 14, 1978, one of petitioners requested that respondent's agent instead issue a restricted Form 872, which was done. Restricted consents are not used unless the taxpayer insists. The restricted Form 872 was signed by petitioners on September 22, 1978, received by respondent on September 25, 1978, and signed on behalf of respondent on October 12, 1978. This Form 872 contains the following addition to the preprinted form: The amount of any deficiency assessment is to be limited to that resulting from any adjustment to; ordinary losses from cattle breeding operations claimed on Schedule F (Form 1040), ordinary and/or capital losses from *16 cattle breeding operations claimed on Form 4797 (Form 1040), and investment credits arising from cattle breeding operations claimed on Form 3468 (Form 1040), all of which relates to cattle breeding operations acquired from Southern Star Land and Cattle Company, Inc., including any consequential changes to other items based on such adjustment. On January 23, 1980, petitioners signed a Form 872-A (an indefinite extension) which had attached to it on a separate sheet, language identical to that quoted above. The notice of deficiency was mailed to petitioners on April 4, 1984. In April 1979 petitioners' income tax returns for the calendar years 1974 and 1975 were assigned to another revenue agent for audit of the Schedule F losses arising out of petitioners' cattle operations. The years 1976 and 1977 were later assigned to the same agent. Gordon had been identified as a "Southern Star" investor early in 1978, so the revenue agent, on April 5, 1979, sent to petitioners an information document request. The general description of the documents were: Copies of documents on attached list pertaining to Southern Star. Copies of your 1976 and 1977 personal income tax return (Form *17 1040).
The detailed description of the Southern Star documents requested includes sales agreements, management agreements, promissory notes, etc. On May 18, 1979, the revenue agent received from petitioners a set of documents, [2] each dated December 29, 1973, which included copies of the sales agreement between petitioners and Management reflecting a purchase by Gordon and Milton Green (Green) of one breeding unit consisting of five female cows, the management agreement, the security agreement, the subscription agreement, and the promissory note. Each document was signed by Green and Gordon. The management agreement and the security agreement also show Management as the other party. The only names on the subscription agreement are those of Gordon and Green. The documents also include a promissory note dated April 1, 1974, and a series of promissory notes, most of which are dated December 29, 1973, and provide for monthly payments starting on January 1, 1975. Each note runs to Management. Finally the series of documents includes herd analysis reports *18 for the years 1974 through 1979. These reports provide detailed information about the Gordon-Green herd of five cows including births of calves and proceeds of sales. At the top of most of these herd analysis reports appear the words "Cattle Management Assignment," but most documents are on preprinted forms on most of which appears in large type the name Southern Star Land & Cattle Co., Inc. The address shown for Southern Star on the June 30, 1974, report is the same as that shown for Management in the sales and management agreements. [3] Some of these forms show sale proceeds being applied to principal and interest, and to maintenance fees due to Southern Star. On May 25, 1976, Gordon signed a document modifying the cattle breeding contracts in one respect. The document is addressed to Southern Star and concludes with the following language: This change applies whether the original contract was with Southern Star Land & Cattle Co., Inc., Cattle Management, Inc., or Livestock Management Inc.
The revenue agent issued her report of examination on Form 4549-A on June 4, 1979. This report was attached to a 30-day *19 letter sent to petitioners which letter is not in the record. The report recites that Gordon was the person with whom examination changes were discussed. The report disallows Schedule F losses for each of the years 1974 through 1977. The issue is stated to be: Whether the taxpayer is engaged in the trade or business of cattle breeding or has merely entered into a "financing arrangement" with Southern Star and/or its affiliates as contemplated in a debtor/creditor relationship or as an investor in a security.
The report recites that on December 29, 1973, petitioner entered into an agreement with Cattle Management, Inc. pursuant to which he purchased a one-half interest in five cows. The report describes some of the other related documents and then sets forth general facts of a typical Southern Star program. The description of a typical program fits the documents produced by Gordon except that the purchase price paid by Gordon and Green was $ 36,000 for the five females instead of $ 40,000 which became the standard price in 1974. [4]
*20 Sometime between June 4, 1979, and August 14, 1979, Gordon contacted his certified public accountants for assistance in preparing and filing a written protest to the 30-day letter. Gordon's regular accountant, an employee of Wilson, Stoneberg, Radler, Woltson & Nenman, P.A., by the name of Penzell, had been a revenue agent and prior to accepting employment with the CPA firm, had worked on the Southern Star investigation. Therefore, he suggested to Wilson, one of the partners, that he should be relieved of responsibility for handling this particular tax matter for Gordon. Penzell was not called as a witness and we cannot determine from the record whether Penzell explained to Gordon the reasons for his being unable to handle the tax matter, however we assume that either he or Wilson explained to Gordon the nature of the problem. On August 14, 1979, Wilson, on behalf of the CPA firm, filed a written protest accompanied by a power of attorney. The protest includes the following language: We believe that the items in question with regard to Mr. Gordon's 1974, 1975, 1976 and 1977 tax returns concerning his acquisition of cattle and related maintenance contract with Southern Star *21 Land and Cattle Co., Inc. have been properly treated as filed per the above tax returns.
In the protest petitioners requested an appellate conference on the matter, but instead the Gordon audit was placed in suspense. On or about November 8, 1979, Form 872-A extensions were submitted to petitioners for execution with respect to the years 1974 through 1977. On November 29, 1979, Wilson wrote to the Internal Revenue Service, apparently at the request of Gordon, with respect to the new extensions. Wilson's letter reads in part as follows. "Since the only issue in question is the cattle-breeding activity, please incorporate the same restrictive language on the form 872-A as that which appears on the original form 872." On January 18, 1980, one of respondent's agents sent to Wilson Forms 872-A for the 4 years. The form for the years 1974 and 1975 contained the same language (quoted above) which was used on the extension signed by petitioners on September 22, 1978. The Form 872-A for the years 1976 and 1977 contained slightly different language in that the reference to Southern Star Land and Cattle Co., Inc. was deleted. The intent of the revenue agent reviewer who corresponded *22 with Gordon and Wilson on the matter of this Form 872-A was to keep the statute of limitations from running with respect to petitioners' Schedule F proposed disallowance as set forth in the revenue agent's report. Upon receipt of the restricted consents covering the 4 years, petitioners' case was allowed to remain in suspense. Wilson fails to recollect any facts pertaining to this matter, other than that Penzell's conflict caused Wilson to represent Gordon. However, his normal practice was to have the 30-day letter and the taxpayer's tax return in front of him when he prepared the protest. His normal practice also was to discuss a protest with a taxpayer and to furnish a copy of a protest to him. We assume that Wilson followed that practice here and that both he and Gordon must have understood that Management was an affiliate of Southern Star and that the Schedule F losses which were proposed to be disallowed arose out of Gordon's purchase of one-half of a Southern Star herd. The record does not contain an actual copy of the extension for 1976 and 1977, but that extension must have been executed. Without the execution of a Form 872-A for 1976 and 1977, the 3-year statute on *23 both 1976 and 1977 would have expired prior to April 4, 1984, when the statutory notice was issued. Petitioners make no point that the years 1976 and 1978 were barred at the time the notice of deficiency was issued. We thus conclude that restricted extensions were executed for 1976 and later years which included the broader language. Based on the entire record, we find that Gordon knew that Southern Star and Management were related to each other at or prior to the time he signed the first restricted Form 872 on September 22, 1978. He further knew that the adjustments being considered by respondent, first to petitioners' 1974 income tax return and then to their 1975, 1976, and 1977 returns, were the Schedule F losses arising out of the Management cattle purchase. The intent of both parties in signing the series of restrictive consents was to limit respondent to determining deficiencies based on petitioners' purchase from Management of a one-half interest in one unit of cattle under the Southern Star program. OPINION Many years ago this Court held, in construing a predecessor of Form 872, that: We are without power of a court of equity and we can not substitute another *24 consent for that expressed by the parties. * * * On the other hand, if the expression used and the language of the instrument is merely ambiguous, the rules of construction with respect to doubtful or ambiguous contracts or documents are applicable here. * * * * * * In construing the instrument so as to arrive at the intention of the parties we must do so in the light of the circumstances surrounding the parties when the instrument was executed. We should place ourselves, as nearly as may be, in the situation of the parties so as to view the circumstances as they viewed them and in doing so we are better enabled to judge the meaning of the language used. * * *
Constitution Publishing Co. v. Commissioner,22 B.T.A. 4266, 428-429 (1931). Petitioners argue, on the basis of Constitution Publishing Co., that the reference to Southern Star is unambiguous and the years 1974 and 1975 were extended only as to a cattle program purchased from Southern Star, not one purchased from Cattle Management. Petitioners rely on the first part of the above quotation but they ignore the direction of this Court that we should put ourselves in the same position as the *25 parties in construing the instrument. Petitioner in his testimony strenuously denied that he had any knowledge of Southern Star. He testified that Wilson explained to him that respondent wanted to keep the statute open "to look into if [he] had purchased any cattle from Southern Star." Nothing in this record corroborates petitioner's oral testimony; in fact it is contradicted by almost everything else in this record. This Court may reject uncontroverted testimony which is improbable, unreasonable, or questionable. Demkowicz v. Commissioner,551 F.2d 929 (3d Cir. 1977), reversing T.C. Memo. 1975-278; Baird v. Commissioner,438 F.2d 490, 493 (3d Cir. 1970). In this case, Gordon's testimony is improbable, unreasonable, and certainly questionable. Gordon testified that he had heard about the cattle investment "from a friend." He did not say what information he had received, particularly whether he saw at any time anything in writing explaining the program. If he had, unquestionably the explanation would have been by and with respect to Southern Star. While the record in this case is fairly sketchy as to the Southern Star program, *26 we need not shut our eyes to facts found by this Court in the four prior cases involving investors in Southern Star. It borders on the ridiculous for Gordon to take the position that after signing the 1976 contract amendment he did not fully comprehend that he had invested in a Southern Star program. That document was so short that the concluding sentence could not have escaped Gordon's attention. We simply do not believe his denial of knowledge. Moreover, Gordon claims to be totally inexperienced in dealing with the Internal Revenue Service, testifying that this was the first time he had been audited. However, he was sufficiently sophisticated as to the audit process to prepare his own tax returns, to handle the audit himself, and particularly to be knowledgeable enough to request a restricted consent. Whether Gordon knew in November 1977 that he had been targeted as a Southern Star investor is unclear. The record shows that he was identified as such by respondent in 1978, and there is no indication of a different reason for respondent keeping 1974 open. In 1978 when he requested a restricted consent, it would be contrary to human experience for that request to have been *27 made without a discussion by Gordon with a revenue agent as to why respondent wanted the years 1974 and 1975 to remain open through 1980. Gordon's explanation that he executed the restricted consent to give respondent an opportunity to ascertain whether or not he had purchased a herd of cattle from Southern Star is too pat. It reflects a cleverishly fabricated story in order to attempt to take a very technical advantage of the restriction language. Gordon further admits that he reviewed the explanation of the adjustments attached to the 30-day letter. He could not have failed to understand that the proposed adjustment was to his Schedule F losses, described as part of the Southern Star cattle program. Moreover, he had to have understood that the only adjustment proposed was as to the cattle-breeding losses claimed on his returns. Thus his testimony that Wilson explained that the 1980 restricted consent was to allow respondent to ascertain whether Gordon had purchased cattle from Southern Star is simply further fabrication, contradicted quite plainly although not directly by Wilson's own testimony. Even were we to believe that Gordon thought that the 1978 restricted consent *28 did not apply to him in fact since it referred only to a Southern Star herd, which we do not believe, he and thus petitioners cannot have been deceived as to the 1980 consent. Gordon's contentions border on being frivolous. The case of Mulford v. Commissioner,66 F.2d 296 (3d Cir. 1933), is closely analogous. There the problem with the waiver was that the year to which it applied was omitted. There was only one year under examination by the Internal Revenue Service and the Court concluded that, inevitably, the waiver was intended to apply to that particular year. As the Court of Appeals said "The waiver was intended to apply to that year, otherwise it would not have been executed, for there was no other tax or year in question that called for a waiver." Mulford v. Commissioner, supra at 297. We said in our Memorandum Sur Order dated October 16, 1985, that the 1978 and 1980 consents must have been intended to apply to petitioners' cattle breeding operations. After trial of the issue, we have concluded the same. The consents were intended to apply to Gordon's purchase from Management. The parties did not engage in useless acts; "effective and *29 not * * * futile act[s were] intended." Stange v. United States,282 U.S. 270, 277 (1931). As we explained in Addler v. Commissioner,85 T.C. 535, 540 (1985), when petitioners show that the statutory notice is issued beyond the normal applicable statute of limitations, the petition establishes a prima facie case, switching the burden of going forward with the evidence to respondent. The showing of consents, which extended the statute past the date on which the notice of deficiency is issued shifts the burden of going forward back to the party pleading the statute. Moreover, the burden of proof, the burden of ultimate persuasion, never shifts from the petitioner. Petitioners have failed to discharge their burden of proof in this case and therefore the years 1974 and 1975 are not barred by the running of the statute of limitations. There remains to be considered, however, petitioners' objections to respondent's last-minute amendment to his answer. The statute of limitations issue, which we tried on November 6, 1985, had nothing to do with a substantial underpayment attributed to a tax-motivated transaction as defined in section 6621(c). The *30 disallowance of the Schedule F losses arising out of Gordon's Southern Star investment was disposed of by our Memorandum Sur Order dated October 18, 1985, several weeks prior to the filing by respondent of his motion for leave to file his amendment to answer. If we had not been willing to set aside our October 16, 1985, order so as to permit petitioners to supplement the record in connection with our consideration of respondent's motion for partial summary judgment, decision would have appropriately been entered prior to the filing by respondent of his motion to amend his answer. Petitioners' objection to respondent's motion to amend his answer will be sustained. See Law v. Commissioner,84 T.C. 985 (1985). Moreover, this is not an appropriate case for the award of damages under section 6673. As a consequence, we will reverse our order entered on November 6, 1985, granting respondent's motion to amend his answer and allowing the filing of the amended answer and the amended answer will be stricken from the record. However, we will grant respondent's motion for partial summary judgment. Decision will have to be entered under Rule 155. Appropriate orders will *31 be entered.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The transcript incorrectly identifies these documents as Exhibit N. They actually were identified as Exhibit M. ↩
3. Southern Star apparently changed its address in 1975. ↩
4. In 1973 the standard purchase price was $ 7,200 per cow, the price paid by Gordon and Green. See Cherin v. Commissioner, 89 T.C.    ↩ (Nov. 23, 1987).