S. DWIGHT WOODS AND MARILYN WOODS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 35566-86.        Filed April 11, 1989.

*Howard M. Potts,* for the petitioners.
*Robert M. Fowler,* for the respondent.

OPINION

RUWE, *Judge:* On May 30, 1986, respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1978 in the amount of $11,023. The substantive adjustments made by respondent in his notice of deficiency are not in dispute. The sole issue for decision is whether respondent issued the notice of deficiency to petitioners after the applicable period set forth in the statute of limitations had expired.

All of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated by this reference.

Petitioners resided in Johnson County, Kansas, when they filed their petition in this case. They timely filed their Federal income tax return for 1978 with the Internal Revenue Service Center at Austin, Texas.

On their 1978 income tax return, petitioners reported a $45,000 loss from Solar Equipment, Inc., a subchapter S corporation. Petitioners reported Solar Equipment, Inc.'s tax identification number as 43-1156106 on their return.

On March 23, 1982, petitioners, at respondent's request, executed a Form 872, "Consent to Extend the Time to Assess Tax," for the taxable year 1978. Respondent accepted the Form 872, extending respondent's time to make an assessment for taxable year 1978 to June 30, 1983. The Form 872 extension was restricted to adjustments relating to "Solar Equipment, Inc. EIN: 43-1156196." Solar Equipment, Inc.'s correct tax identification number is not revealed by the stipulation and attached exhibits. However, since respondent's opening brief requested a finding that Solar Equipment, Inc.'s correct tax identification number is 43-1156196 and, petitioners' reply brief did not object, we will proceed on the assumption that 43-1156196 is the correct tax identification number.

On December 17, 1982, respondent sent a letter to petitioners offering to settle the Solar Equipment, Inc., issue for the 1978 taxable year. In the letter, respondent asked petitioners to send documentation of their cash investment in Solar Equipment, Inc. In response, petitioners sent a letter to respondent indicating they had not decided whether to settle the case. They enclosed a copy of a check payable to "Davis Equities Corp.," in the amount of $12,507 which contained the notation "acct/o Solar Equip., Inc." in the bottom left-hand corner.

On February 23, 1983, respondent sent a letter to petitioners asking them to execute a consent further extending the period for making assessments for taxable year 1978. Respondent's letter indicated that this extension was necessary because he was examining an entity identified only by the number 43-1156196 and that adjustments might result which could affect petitioners' 1978 return. The extension form attached to the letter (Form 872-A, "Special Consent to Extend the Time to Assess Tax") was not

restricted to any particular adjustments. Petitioners did not execute this extension form. In response, petitioners wrote to respondent that they had "already signed an extension on this. Our copy was returned to us stamped 'received by the Wichita office.'"

On March 11, 1983, respondent sent a letter and a Form 872-A to petitioners. The letter read in part as follows:

We received your letter advising us that you have previously signed an extension. That is correct. The extension you previously executed expires June 30, 1983. Therefore, since the examination of Solar *Environments,* Inc. has not been completed, we need to further extend the statute of limitations. Enclosed are forms 872-A restricted to adjustments from Solar *Environments,* Inc. for you to sign and return. [Emphasis added.]

The letter erroneously referred to Solar Environments, Inc. The Form 872-A that accompanied the letter erroneously referred to the taxable year 1979, and contained erroneous restrictive language making the extension applicable only to assessments resulting from adjustments made to "Solar *Environments,* Inc. *#43-1156200.*" (Emphasis added.) Petitioners signed the Form 872-A and mailed it to respondent. Upon review of the Form 872-A, respondent discovered that the tax period on the consent was erroneously shown as the period ended December 31, 1979, instead of December 31, 1978. To correct this error, respondent sent a new Form 872-A to petitioners containing the proper tax period. Petitioners signed the new Form 872-A on March 29, 1983, and it was accepted by respondent on April 8, 1983. The restrictive language of the new Form 872-A still erroneously referred to "Solar *Environments,* Inc. *#43-1156200.*" (Emphasis added.)

At the time they executed each extension, petitioners and respondent intended that the extensions would allow respondent additional time to complete his examination of petitioners' 1978 return. During 1978, petitioners had no investments in or affiliation with Solar Environments, Inc. The first extension of the period of limitations was restricted to adjustments relating to "Solar Equipment, Inc. EIN: 43-1156196" which petitioners had invested in and with respect to which they had taken a deduction on their 1978 return. At the time petitioners executed the second extension, Form 872-A, on March 29, 1983, the statute of

limitations barred assessment as to all adjustments except those relating to Solar Equipment, Inc. At the time they executed the Form 872-A in 1983, both parties intended and agreed to extend the period for assessment for adjustments relating to Solar Equipment, Inc. even though the Form 872-A mistakenly referred to Solar Environments, Inc.

Respondent was solely responsible for the preparation of each of the extensions in this case. On April 12, 1984, respondent prepared an examination report reflecting adjustments to petitioners' return with respect to their investment in Solar Equipment, Inc. At that time, respondent first became aware that the extension executed by the parties the previous spring did not refer to Solar Equipment, Inc. EIN: 43-1156196, but rather to Solar Environments, Inc. #43-1156200.

Section 6501(a)[1] provides that respondent may assess deficiencies in income taxes within 3 years after the due date of a timely filed return. Section 6501(c)(4) allows a taxpayer and respondent to consent in writing to extend the period for assessment.

The bar of the statute of limitations is an affirmative defense, and the party raising it must specifically plead it and carry the burden of proof. Rule 142(a); *Adler v. Commissioner*, 85 T.C. 535, 540 (1985). A party pleading the statute of limitations as a bar to assessment establishes a prima facie case by showing that the statutory notice was mailed beyond the normally applicable period provided by the statute of limitations. The burden of going forward then shifts to the other side to show that the bar of the statute of limitations is not applicable. *Adler v. Commissioner, supra* at 540. See *Concrete Engineering Co. v. Commissioner*, 58 F.2d 566 (8th Cir. 1932), affg. 19 B.T.A. 212 (1930); *Stern Bros. & Co. v. Burnet*, 51 F.2d 1042 (8th Cir. 1931), affg. 17 B.T.A. 848 (1929).

In this case, petitioners timely filed their joint tax return for 1978, which means that it is deemed to have been filed on April 15, 1979. Sec. 6501(b). Ordinarily, the period within which respondent could effectively issue a notice of defi-

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

ciency for petitioners' taxable year 1978 would have expired on April 15, 1982. Sec. 6501(a). Respondent must therefore introduce evidence establishing an exception.

It is undisputed that the parties extended the period of limitations on assessment for 1978 adjustments related to Solar Equipment, Inc. to June 30, 1983. Respondent did not issue his statutory notice until May 30, 1986. Therefore, the issue we must decide is whether the Form 872-A which petitioners signed on March 29, 1983, and which respondent accepted on April 8, 1983, was a valid extension with respect to respondent's determination of a deficiency based upon disallowance of petitioners' reported loss from "Solar Equipment, Inc." despite the fact that the Form 872-A referred to "Solar Environments, Inc."

A consent extending respondent's time to assess taxes is not a contract. However, contract principles are significant because section 6501(c)(4) requires that the parties reach a written agreement as to the extension. *Piarulle v. Commissioner*, 80 T.C. 1035, 1042 (1983). The term agreement means a manifestation of mutual assent. *Piarulle v. Commissioner, supra* at 1042. It is the objective manifestation of mutual assent as evidenced by the parties' overt acts that determines whether the parties have made an agreement. *Kronish v. Commissioner*, 90 T.C. 684, 693 (1988).

Neither party has cited a case that is "on all fours" with the facts in this case, however, both argue that the principles stated in *Constitution Publishing Co. v. Commissioner*, 22 B.T.A. 426 (1931), should control the outcome.

Respondent argues that the reference in the extension to "Solar Environments, Inc." is ambiguous. If an ambiguity exists in a written extension of the period for making assessments, we will admit extrinsic evidence to clarify the ambiguity and to determine the parties' intent. The extension will then be interpreted in accordance with the parties' intent. *Constitution Publishing Co. v. Commissioner, supra* at 428.

A written instrument is ambiguous if it can reasonably be interpreted to have more than one meaning.[2] An ambiguity may be patent, i.e., an ambiguity appearing on the face of an instrument, or an ambiguity may be latent. A latent

---

[2]See *Sawyer v. Commissioner*, T.C. Memo. 1988-132.

ambiguity exists when the language in an instrument is clear and suggests a single meaning, but some collateral matter makes the *meaning* of the instrument uncertain. See *Cathbake Investment Co. v. Fisk Electric Co.,* 700 F.2d 654, 656 (11th Cir. 1983). "The usual instance of a latent ambiguity is one in which a writing refers to a particular person or a thing and is thus apparently clear on its face, but upon application to external objects is found to fit two or more of them equally." *Easton v. Washington County Insurance Co.,* 391 Pa. 28, 137 A.2d 332, 336 (1957). See *Cathbake Investment Co. v. Fisk Electric Co., supra; Matter of F. and L. Huxtable Living Tr.,* 243 Kan. 531, 757 P.2d 1262 (1988); *Hall v. Mullen,* 234 Kan. 1031, 678 P.2d 169 (1984). See also 4 S. Williston, Contracts, sec. 627, p. 898 (3d ed. 1961).

In *Constitution Publishing Co.,* the written consent to extend the period for making an assessment referred to the tax liability "for the year 1922, seven months ended July 31." *Constitution Publishing Co. v. Commissioner, supra* at 427. It was clear that the taxpayer reported its income on a calendar year basis and that the year in issue was the calendar year 1922. We found that the expression "for the year 1922" and the expression "seven months ended July 31," which immediately followed, were in conflict with each other and, therefore, created an ambiguity. *Constitution Publishing Co. v. Commissioner, supra* at 427, 428. Since this ambiguity was apparent from the face of the instrument, it could be characterized as a patent ambiguity. Having found an ambiguity, we then proceeded to resolve the ambiguity by determining the intent of the parties who signed the instrument. *Constitution Publishing Co. v. Commissioner, supra* at 428.

A written extension is not ambiguous when it is clear on its face and its meaning is certain, even though it misstates the intent of both parties. *Constitution Publishing Co. v. Commissioner, supra* at 427. The Form 872-A extension in this case is not ambiguous. It clearly refers to "Solar Environments, Inc. #43-1156200." We have found as a fact that the parties intended to and did agree to extend the period for making assessments relating to "Solar Equipment, Inc. EIN: 43-1156196." The foregoing situation is

more properly characterized as a mutual mistake. A mutual mistake exists "where there has been a meeting of the minds of the parties and an agreement actually entered into but the agreement in its written form does not express what was really intended by the parties." Black's Law Dictionary, p. 920 (5th ed. 1979). This type of mutual mistake is sometimes referred to as a "scrivener's mistake." See *Newton v. Brown,* 222 Neb. 605, 386 N.W.2d 424 (1986).

Having determined that there is no ambiguity, we must determine whether any other contract principles are applicable to the instant case where, as we have found, the written agreement mistakenly fails to express the mutual intent of the parties. One such principle is that where a written agreement does not conform with the actual agreement between the parties, a court may reform the writing to conform with the parties' intentions. See 1 Restatement, Contracts 2d, sec. 155, p. 406 (1981); 13 S. Williston, Contracts, sec. 1547, p. 111 (3d ed. 1970); 3 A. Corbin on Contracts, sec. 614, p. 713 (1960).

Reformation is an equitable remedy used to reframe written contracts to reflect the real agreement between the parties when, because of mutual mistake, the writing does not embody the contract as actually made. Black's Law Dictionary, *supra* at p. 1152. See *Rocanville Corp. v. Natural Gas Pipeline Co.,* 823 F.2d 92, 94 (5th Cir. 1987).

The Restatement, Contracts 2d, states:

Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may * * * reform the writing to express the agreement * * * . [1 Restatement, Contracts 2d, sec. 155, p. 406 (1981).]

The Restatement and the courts generally do not allow contract reformation when there is a mutual mistake as to the underlying facts. They do allow reformation when there is a mistake in drafting. 1 Restatement, Contracts 2d, secs. 152, 155, pp. 385, 406. See *Newton v. Brown, supra; St. Pius X House of Retreats v. Camden Dioc.,* 88 N.J. 571, 443 A.2d 1052 (1982). "Contracts are not reformed for mistake; writings are. * * * With rare exceptions, courts have been tenacious in refusing to remake a bargain entered into

because of mistake. They will, however, rewrite a writing which does not express the bargain." J. Calamari & J. Perillo, Law of Contracts, sec. 9-31, p. 392 (3d ed. 1987) (fn. ref. omitted).

Petitioners point out that this Court has previously stated that we will not look to the true intent of the parties if the written extension is unambiguous. In *Constitution Publishing Co.,* we stated:

The question here is whether the instrument contains a mistake of expression as to the period, both parties intending something else, that is, whether the instrument embraced terms not intended by the parties and does not contain their true meaning and intention, or whether the expressions used are merely ambiguous and are subject to the rules of construction for ambiguous instruments. *If the language used were clear and without ambiguity and referred to the period "ended July 31, 1922," we can not resort to any rules of construction to give the waiver a different meaning, regardless of the intention of the parties. We are without power of a court of equity and we can not substitute another consent for that expressed by the parties. We can not reform the instrument, although both parties intended something else.* * * * [*Constitution Publishing Co. v. Commissioner, supra* at 427-428. Emphasis added.]

Petitioners also point to the case of *Atlas Oil & Refining Corp. v. Commissioner,* 22 T.C. 552 (1954). In that case, consents were executed extending the period of limitations for fiscal years ended November 30, 1942, 1943, and 1944 based upon the belief that the taxpayer had properly filed returns on a fiscal year basis. The taxpayer was ultimately found to be taxable on a calendar year basis. In *Atlas,* there was a mistake as to a fact underlying the extensions, i.e., that the taxpayer was taxable on a fiscal year basis. The situation in *Atlas* is thus distinguishable from a mere "scrivener's error." However, in rejecting the Government's argument that the fiscal year extensions should be applied to the taxpayer's calendar years we stated:

None of them [the extensions] purported to extend the period of limitations with respect to either of the 2 calendar years here involved. True, certain testimony of petitioner's representatives indicates that no thought was given at the time as to whether the limitations periods were being extended for fiscal or calendar years, the objective being to extend the periods for the purpose of finally settling petitioner's tax liability. *However, the difficulty with making inquiry into such intent is that the consents were clear and unambiguous.* They undertook to extend the

periods of limitation for "the taxable year ended November 30." *And since the consents were unambiguous, we must take them as we find them.* * * * . [*Atlas Oil & Refining Corp. v. Commissioner,* 22 T.C. at 560. Emphasis added.]

The emphasized portions of the above-quoted statements from *Constitution Publishing Co.* and *Atlas Oil & Refining Corp.,* could arguably be dismissed as dicta on the basis that our ability to reform the writings was irrelevant since we found the writing to be ambiguous in *Constitution Publishing Co.* and found that the mistake in *Atlas Oil & Refining Corp.* was a misperception of the underlying facts as opposed to mistaken use of words in the writing. However, to the extent those cases state that we will not consider the actual agreement and intention of the parties when there has been a drafting error in the written extension, those cases are inconsistent with our general application of contract principles in determining the effect of a written extension.

The rationale of the two aforementioned cases appears to be based upon the premise that we lack equitable powers. It is also clear that section 155 of the Restatement, pertaining to reformation of a writing in order to express the parties' actual agreement, is based upon equitable principles. 1 Restatement, Contracts 2d, sec. 155, comment d. See *Travelers Indem. Co. v. Calvert Fire Ins. Co.,* 798 F.2d 826, 835 (5th Cir. 1986), modified on another issue 836 F.2d 850 (5th Cir. 1988).

An historical analysis of our cases discloses numerous instances where we have applied equitable principles in deciding issues over which we had jurisdiction. For example, we have applied the equity-based principles of waiver,[3] duty of consistency,[4] estoppel,[5] substantial compliance,[6] abuse of discretion,[7] laches,[8] and the tax benefit rule.[9] "While we cannot expand our jurisdiction through equitable principles,

---

[3]*Armco, Inc. v. Commissioner,* 88 T.C. 946, 963 n. 8 (1987); *Aero Rental v. Commissioner,* 64 T.C. 331, 338 (1975).

[4]*Unvert v. Commissioner,* 72 T.C. 807, 814-817 (1979), affd. 656 F.2d 483 (9th Cir. 1981); *Mayfair Minerals, Inc. v. Commissioner,* 56 T.C. 82 (1971), affd. per curiam 456 F.2d 622 (5th Cir. 1972).

[5]*Boulez v. Commissioner,* 76 T.C. 209, 214-217 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987).

[6]*Taylor v. Commissioner,* 67 T.C. 1071, 1077-1078 (1977).

[7]*Estate of Gardner v. Commissioner,* 82 T.C. 989 (1984).

[8]*Southern Pacific Transportation Co. v. Commissioner,* 75 T.C. 497, 840 (1980).

[9]*Rojas v. Commissioner,* 90 T.C. 1090 (1988), on appeal (9th Cir., Dec. 9, 1988).

we can apply equitable principles in the disposition of cases that come within our jurisdiction." *Berkery v. Commissioner*, 90 T.C. 259, 270 (1988) (Hamblen, J., concurring).

It has been stated that "The Tax Court is a court of limited jurisdiction and lacks general equitable powers." *Commissioner v. McCoy*, 484 U.S. 3, 7 (1987). However, the context in which this statement was made involved the question of whether an appellate court reviewing a decision of the Tax Court could order relief "to achieve a fair and just result" even though the Tax Court had no jurisdiction over the subject matter of that relief. *Commissioner v. McCoy*, 484 U.S. at 6 . The Supreme Court held that the appellate court's authority was restricted to review those matters over which the Tax Court had jurisdiction and that the Tax Court could not expand that jurisdiction based upon equitable considerations. Given the context in which it was made, the above quoted statement simply means that we lack general equitable powers to expand our statutorily prescribed jurisdiction. For example, in a recent opinion, the Sixth Circuit, while recognizing the existence of *Commissioner v. McCoy, supra,* held that the equitable principle of "judicial estoppel" should be applied by this Court in deciding a deficiency over which we had jurisdiction. *Reynolds v. Commissioner,* 861 F.2d 469 (6th Cir. 1988), revg. a Memorandum Opinion of this Court.[10]

The Supreme Court in *McCoy* based its statement about our lack of general equitable powers on *Commissioner v. Gooch Milling & Elevator Co.,* 320 U.S. 418 (1943). In that case, the Supreme Court upheld the determination of the Board of Tax Appeals that the doctrine of equitable recoupment could not be used to expand the Board's jurisdiction to allow it to determine whether there was an overpayment of tax for a year which was not before the Board. In *Commissioner v. Gooch Milling & Elevator Co., supra,* there was a specific statutory provision that precluded the Board from determining the overpayment or

---

[10]Our Memorandum Opinion did not discuss judicial estoppel. *Reynolds v. Commissioner,* T.C. Memo. 1987-261. The Fifth Circuit has also recently held that the equitable principle of "quasi estoppel" or the "duty of consistency" applies in the Tax Court. *Herrington v. Commissioner,* 854 F.2d 755 (5th Cir. 1988), affg. *Glass v. Commissioner,* 87 T.C. 1087 (1986).

underpayment of tax for any year not before the Board.[11] In upholding the Board's opinion and based upon the specific statutory language restricting our jurisdiction, the Supreme Court stated that "to allow the Board to give effect to an equitable defense which of necessity is based upon a determination foreign to the Board's jurisdiction would be contrary to the expressed will of Congress." *Commissioner v. Gooch Milling & Elevator Co., supra* at 421. In a footnote, the Supreme Court observed:

> Before sec. 272(g) of the Internal Revenue Code was enacted, the Board held that it had jurisdiction to determine an overpayment for a year as to which no deficiency had been found by the Commissioner and to apply that overpayment against the liability for the year as to which he had found a deficiency, thus giving effect to the doctrine of equitable recoupment. Appeal of E. J. Barry, 1 B.T.A. 156. Soon thereafter, however, Congress passed sec. 274(g) of the Revenue Act of 1926 (now sec. 272(g) of the Internal Revenue Code) *taking such jurisdiction away from the Board.* [*Commissioner v. Gooch Milling & Elevator Co.,* 320 U.S. 418, 421 n. 7 (1943). Emphasis added.]

There is an implication from the above quotation that the doctrine of equitable recoupment was appropriately applied by the Board of Tax Appeals up until the time Congress restricted its jurisdiction in that specific area. The legislative history behind enactment of the mitigation provisions, sections 1311-1315, indicates that Congress affirmatively disavowed any intention to eliminate this Court's consideration of equitable doctrines and principles. S. Rept. 1567, 75th Cong., 3d Sess. (1938), 1939-1 C.B. (Part 2) 815;[12]

---

[11]The Supreme Court was referring to sec. 272(g) of the Revenue Act of 1934, 48 Stat. 680, now embodied in sec. 6214(b) of the Code.

[12]The Senate Committee report stated:

In each case, under existing law, an unfair benefit would have been obtained by assuming an inconsistent position and then taking shelter behind the protective barrier of the statute of limitations. Such resort to the statute of limitations is a plain misuse of its fundamental purpose. The purpose of the statute of limitations to prevent the litigation of stale claims is fully recognized and approved. But it was never intended to sanction active exploitation, by the beneficiary of the statutory bar, of opportunities only open to him if he assumes a position diametrically opposed to that taken prior to the running of the statute. *The Federal courts in many somewhat similar tax cases have sought to prevent inequitable results by applying principles variously designated as estoppel, quasi-estoppel, recoupment, and set-off. For various reasons, mostly technical, these judicial efforts cannot extend to all problems of this type. Nor can they provide a uniform, systematic solution of these problems. Legislation has long been needed to supplement the equitable principles applied by the courts* and to check the growing volume of litigation by taking the profit out of inconsistency, whether exhibited by taxpayers or revenue officials and whether fortuitous or the result of design. [S. Rept. 1567, 75th Cong., 3d Sess. (1938), 1939-1 C.B. (Part 2) 815. Emphasis added.]

*Mayfair Minerals, Inc. v. Commissioner,* 56 T.C. 82, 94 (1971), affd. per curiam 456 F.2d 622 (5th Cir. 1972).

On the other hand, we have consistently held that we cannot expand our *jurisdiction* by giving equitable relief from statutorily prescribed jurisdiction requirements. See *Knapp v. Commissioner,* 90 T.C. 430, 440 (1988), affd. 867 F.2d 749 (2d Cir. 1989); *Estate of Rosenberg v. Commissioner,* 73 T.C. 1014, 1017-1018 (1980). There is a difference, however, between the application of equitable principles to decide a matter over which we have jurisdiction and the exercise of "general equitable powers" to take jurisdiction over a matter not provided for by statute. One illustration of this is that while proscribing the latter, the Supreme Court has recently sanctioned our application of the tax benefit rule in order to prevent "transactional inequities." *Hillsboro National Bank v. Commissioner,* 460 U.S. 370 (1983). We described the tax benefit rule as "a judicially created doctrine embodying both transactional tax accounting and equitable aspects." *Hillsboro National Bank v. Commissioner,* 73 T.C. 61, 66 (1979).

The instant controversy involving the issue of whether assessment of tax for a year properly before us is barred by the statute of limitations, is clearly within the jurisdiction of the Court. An issue based on the statute of limitations is a defense and not a plea to the jurisdiction of this Court. *Badger Materials, Inc. v. Commissioner,* 40 T.C. 1061 (1963), modifying 40 T.C. 725 (1963). In deciding this case, we are not expanding on our statutory jurisdiction.

Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1978 and issued a notice of deficiency as authorized by section 6212. Petitioners filed a timely petition invoking our jurisdiction to determine their 1978 income tax liability pursuant to section 6213. The parties agree that the correctness of the deficiency, as determined by respondent, is dependent upon whether the period for assessing the deficiency had expired prior to issuance of the notice of deficiency. This in turn depends upon whether the written Form 872-A was effective to extend that period in accordance with what the parties intended. We clearly have jurisdiction to determine whether a deficiency exists and, in so doing, must determine the

efficacy of the Form 872-A. In so doing, we may apply equitable principles. To the extent that *Constitution Publishing Co. v. Commissioner* and *Atlas Oil & Refining Corp. v. Commissioner,* indicate otherwise, those cases will no longer be followed.[13]

That Congress intended the Tax Court to have full judicial authority to resolve issues over which it has jurisdiction, is indicated by section 7422(e) providing that when a petition is filed in the Tax Court "the district court or the United States Claims Court, as the case may be, shall lose jurisdiction of taxpayer's suit [for refund] to whatever extent jurisdiction is acquired by the Tax Court of taxpayer's suit for refund." Sec. 7422(e). Also section 6512(a) provides that if a valid petition is filed with the Tax Court,

no suit by the taxpayer for the recovery of any part of the tax shall be instituted in any court except—

(1) As to overpayments determined by a decision of the Tax Court which has become final; and

(2) As to any amount collected in excess of an amount computed in accordance with the decision of the Tax Court which has become final; and

(3) As to any amount collected after the period of limitation upon the making of levy or beginning a proceeding in court for collection has expired; but in any such claim for credit or refund or in any such suit for refund the decision of the Tax Court which has become final, as to whether such period has expired before the notice of deficiency was mailed, shall be conclusive, and

(4) As to overpayments attributable to partnership items, in accordance with subchapter C of chapter 63. [Sec. 6512(a).]

See also section 7481 providing for finality of Tax Court decisions. The combined effect of these sections is to channel tax litigation into the Tax Court, to make our decisions binding, and to preclude relitigation of the same issues in another forum. See *Estate of Ming v. Commissioner,* 62 T.C. 519 (1974). This statutory scheme indicates

---

[13]While recognizing that the approach we take today departs from our past statements, the result is the same as that in factually analogous cases in which we found ambiguities to exist thereby allowing the Court to interpret the extension in accordance with the parties intent. See *Gordon v. Commissioner,* T.C. Memo. 1988-9; *Evinrude v. Commissioner,* T.C. Memo. 1980-454. "In a borderline case a court may avoid the necessity of reforming the writing by viewing the issue as one of interpretation." 1 Restatement, Contracts 2d, sec. 155, comment b (1981). We chose the route taken today because we think the written extension here crosses that borderline.

that Congress did not intend to restrict our application of legal and equitable principles to decide matters within our jurisdiction unless it specifically enacted such a limitation. There is no such limitation regarding the principles being applied to resolve the instant case.

We believe that the proper disposition of this case is to reform the written instrument to conform to the agreement and intent of the parties. The evidence is clear and convincing[14] that the parties intended to extend the period of limitations with respect to the matter being examined by respondent, namely "Solar Equipment, Inc. EIN: 43-1156196." That was the only subject that was under examination and the only issue still open under the prior written extension.

In determining that we can give effect to the actual agreement of the parties, we are aware that section 6501(c)(4) requires that extensions be in writing. Such a requirement does not preclude reformation of a written agreement. Indeed, if the agreement were not one required to be in writing, the writing would probably lack sufficient legal significance so as to require reformation. 1 Restatement, Contracts 2d, sec. 155, comment a.[15]

Finally, we do not believe that the mere fact that the mistake in the written extension originated with respondent precludes a reformation. Petitioners, who had actually made the investment, were also mistaken when they signed the document. The circumstances of this case do not warrant withholding relief from a mistake. The mere fact that the party seeking relief did not exercise reasonable care does not preclude reformation. 1 Restatement, Contracts 2d, sec. 155, comment a; sec. 157, p. 416.

Reformation provides a result that both parties agreed to and prevents an unintended and unexpected windfall. The statute of limitations does not bar assessment.

*Decision will be entered for the respondent.*

---

[14]The actual agreement and the fact that the writing contains a "scrivener's mistake" must be established by clear and convincing evidence. 1 Restatement, Contracts 2d, sec. 155, comment c; *Travelers Indem. Co. v. Calvert Fire Ins. Co.*, 798 F.2d 826, 835 (5th Cir. 1986), modified on another issue 836 F.2d 850 (5th Cir. 1988).

[15]Again, we emphasize that we are not changing the actual agreement; we are merely conforming the written document to the actual agreement in circumstances where the writing contains a scrivener's mistake.

Reviewed by the Court.

PARKER, WHITAKER, HAMBLEN, COHEN, SWIFT, GERBER, WRIGHT, WILLIAMS, WELLS, WHALEN, and COLVIN, *JJ.,* agree with the majority opinion.

KÖRNER, *J.,* concurs in the result only.

----

CHABOT, *J.* dissenting: The majority have chosen to declare that this Court has general equitable powers; in the process, they overrule precedents dating back to 1931 and 1954. Respectfully, I dissent.

"Equity" and "equitable" are appealing words. They conjure up visions of "doing right", of "mercy", and of Solomon-like wisdom. Certainly, none of us wants this Court to be perceived as "inequitable". However, this connotation of "equity" and "equitable", and awareness of the antonym, should not be allowed to affect the nature and work of the Court or our decision-making process.

When the judges of this Court (and other courts) have written that this Court does not have general equitable powers, they have not meant that we were forbidden to do anything "equitable", or even that we were forbidden to do anything that equity courts do. Rather, we are forbidden to do things that *only* equity courts do. The distinction is not a play on words. Many devices in English jurisprudence, where our equity court models originated, were equity court innovations but then were taken over or adapted by law courts. The same is true with regard to the development of law and equity courts in the United States. Thus, many devices or procedures that may be described as "equitable" or that may initially have been solely the province of equity courts, have come to be tools and procedures used by law courts. See, e.g., 1 J. Pomeroy, Equity Jurisprudence, secs. 68-95, p. 92 et seq. (5th ed. 1941) (law courts adopted equity courts' treatments of lost instruments, penalties, mortgages and express trusts (in both of which law courts recognize and give effect to so-called "equitable interests"), discovery (which once required the bringing of a separate proceeding in an equity court in order to discover information to be

used in an ongoing proceeding in a law court, requirements of seals, etc.). Thus, the majority's list of "instances where we have applied equitable principles in deciding issues over which we had jurisdiction" (majority opinion p. 784) does not properly lead to the majority's conclusion that this Court has general equitable powers.

On the other hand, there are tools and procedures that are regarded as the province of equity courts *and not of law courts.* Interestingly, for purposes of the instant case, Pomeroy's states that—

A suit to enforce the specific performance of a contract, or to reform a written instrument on the ground of mistake must always belong to the equity jurisdiction, and to it alone, since these remedies are wholly beyond the scope of common-law methods and courts * * * . [1 J. Pomeroy, Equity Jurisprudence, sec. 131, p. 180 (5th ed. 1941).]

If we are to have general equity power (except where limited by our jurisdictional statute, a concession that the majority seems to make), then we embark on a sea with few if any discernible shores.

For example, if we were to conclude by a preponderance of the evidence that the written instrument reflecting a separation agreement does not "fix" the amount payable as child support, but that the parties to that agreement intended that a certain amount be so fixed, then would we have authority to reform the instrument where the reformation would have only tax consequences and not affect the nontax property rights of the parties to the agreement? At the present time, in certain types of cases involving written agreements, we employ the "strong proof" rule while a number of Courts of Appeals follow the *"Danielson* rule" (*Commissioner v. Danielson,* 378 F.2d 771 (3d Cir. 1967), revg. 44 T.C. 549 (1965)). If both parties to an agreement are before us (as where respondent has sent inconsistent notices of deficiency and acts essentially as stakeholder in consolidated cases) and we are convinced by strong proof that the parties' writing misstates the parties' intent, then would we have authority to reform the writing (or to order the parties to reform the writing) and thereby avoid application of a *Danielson* rule standard?

More fertile minds will quickly conjure up other uses for these equity tools or, in the spirit that led to the formation

and wide-spread flourishing of equity courts, create new tools. Was this the role that the Congress envisioned when the Board of Tax Appeals was created?

The majority seek to use the Supreme Court's opinion in *Commissioner v. Gooch Milling & Elevator Co.,* 320 U.S. 418 (1943), in support of their thesis that, when the Congress created the Board of Tax Appeals, it was understood that the Board had general equitable powers. (Majority opinion pp. 785-786.) In *Barry v. Commissioner,* 1 B.T.A. 156 (1924), we held, in effect, that we had power akin to equitable recoupment.

Firstly, if equitable recoupment authority is properly an indicium of general equity powers, then it is important to note that the Congress took pains at the earliest practical opportunity (the Revenue Act of 1926) to make it clear that we did not have that authority. That 1926 Act provision remains, virtually unchanged, in our controlling charter (see the concluding language of sec. 6214(b) of the Internal Revenue Code of 1986). Thus, the Congress did not mean for us to exercise this power.

Secondly, the Board that decided *Constitution Publishing Co. v. Commissioner,* 22 B.T.A. 426 (1931), included nine Members who were on the Board when *Barry* had been decided and when the Congress overruled *Barry. Constitution Publishing* was written by one of those nine members. *Constitution Publishing* was reviewed by the Board. The only dissenter from our opinion in *Constitution Publishing* was not appointed to the Board until 3 months after the enactment of the Revenue Act of 1926. Thus, more than half of the members of the Board had passed through what the majority herein suggest was an exercise of general equitable powers—and the Congress' rejection of that power—and then saw fit to declare that "We can not reform the instrument, although both parties intended something else." 22 B.T.A. 428. Thus, the members who served during the period that the majority direct us to, and so would have been familiar with the Congress' intentions, were virtually unanimous in concluding that we did not have this general equitable power. The majority seek to overcome this evidence by merely overruling it.

Finally, it appears that the majority may be misled by the word "equitable" in the term "equitable recoupment". As Professor Dubroff points out (H. Dubroff, United States Tax Court—An Historical Analysis, p. 484 (1979)) equitable recoupment is—

a doctrine developed and applied by both the courts of common law and equity[873] * * * .

---

[873]McConnell, "The Doctrine of Recoupment in Federal Taxation," 28 Va. L. Rev. 577, 579-84 (1942).

Thus, even if we were to exercise the power of equitable recoupment, that would not be an indication that we have general equitable power. See 1 J. Pomeroy, Equity Jurisprudence, *supra.*

I would not reform the instrument. If the majority are correct in their analysis that the instrument is not ambiguous, then I would hold that respondent is to bear the loss that results from the error of respondent's "scrivener".

I dissent.

NIMS and PARR, *JJ.,* agree with this dissent.