DANIEL J. GOLDBERG and PATRICIA L. GOLDBERG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Goldberg v. Commissioner
Docket No. 30688-87.
United States Tax Court
T.C. Memo 1992-108; 1992 Tax Ct. Memo LEXIS 129; 63 T.C.M. (CCH) 2168; T.C.M. (RIA) 92108; February 24, 1992, Filed *129 Bruce Locke, Shelley Cashion, and Ruth E. Salek, for the petitioners. David W. Johnson, Patricia C. Henry, and Henry C. Griego, for the respondent. FAY, GALLOWAY
FAY
MEMORANDUM OPINION FAY, Judge: This case was heard by Special Trial Judge Lee M. Galloway pursuant to the provisions of section 7443A and Rules 180, 181, and 183. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. This Court agrees with and adopts the Special Trial Judge's opinion, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE GALLOWAY, Special Trial Judge: This case was assigned as one of a group of tax shelter cases identified as involving the lease by taxpayers of children's master sound recordings from Jarelco, Inc. (Jarelco). [1]
*130 Respondent determined deficiencies and additions to tax in petitioners' income tax as follows: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)
6659
6661
6653(a)(1)
6653(a)(2)
1979
$  5,965.00
$ 298.00
$ 1,789.50
-0-
-0-  -0-
1980
763.00
38.15
-0-   -0-
-0-  -0-
1982
13,536.00
-0-  4,060.80
[1] $ 676.00
[2] Respondent also determined that petitioners were liable for the increased rate of interest, for 1979 and 1980, due to substantial underpayments in tax attributable to tax-motivated transactions pursuant to section 6621(c). This matter is before the Court on the parties' cross motions for partial summary judgment filed pursuant to Rule 121. Both parties filed written objections. In their respective motions, each party claims that partial summary judgment is appropriate on the issue of the efficacy of *131 a Form 872-A, Special Consent To Extend The Time To Assess Tax (hereinafter Form 872-A or Special Consent). The sole issue for decision is whether the assessment of the income tax deficiency and additions to tax for the taxable year 1982 is barred by the statute of limitations. A decision on this question depends upon whether petitioners and respondent executed an appropriate waiver of the statute for 1982 prior to the 3-year statutory period for assessment provided for in section 6501. The parties have stipulated that if the period of limitations on assessment has not expired for 1982, then it has not expired for the carryback year 1979. [2] There is similarly no disagreement that if such period has expired for 1982, then it has also expired for the carryback year. A hearing on the respective cross motions was scheduled *132 at a Special Session of the Court held at Houston, Texas. The record includes a stipulation of facts and attached exhibits, affidavits and testimony of Daniel J. Goldberg and David W. Bergeron, two affidavits and testimony of Jacqueline C. Horgan, memorandums filed by the parties in support of their motions, and original and reply briefs filed by the parties after the hearing. [3]
*133 Background
At the time of filing the petition in this action, petitioners were residents of Houston, Texas. Petitioners filed individual income tax returns for the taxable years 1979, 1980, and 1982, with the Internal Revenue Service Center in Austin, Texas. Petitioners' 1982 tax return was mailed to the Internal Revenue Service Center on August 14, 1983, and received on August 16, 1983. During the years in issue, petitioner Daniel J. Goldberg was an attorney engaged in the practice of law. Petitioners' 1982 Federal income tax return contained two Schedules C. The first Schedule C was attributable to Mr. Goldberg's private law practice. The second Schedule C disclosed a business involving the lease of a master recording tape by Mr. Goldberg from Jarelco, an S corporation, whose stock was (and is) wholly owned by an unrelated third party. No income or expenses were reported on petitioners' second Schedule C. Jarelco filed a Form 1120S for its taxable year beginning August 20, 1982, and ending July 31, 1983. With respect to Jarelco's lease of the master recording tape to Mr. Goldberg (petitioner), Jarelco elected under section 48(d)(1) to treat petitioner as having purchased *134 all of a particular tape for its fair market value. Since petitioner was not a shareholder of Jarelco, the corporation did not file a Schedule K-1 (Shareholder's Share of Undistributed Taxable Income, etc.) in his name. Petitioners' 1982 return also included a Schedule E loss from rents, royalties, partnerships, estates, trusts, etc., totaling $ 10,772. The above loss consisted of a duplex rental loss of $ 6,769 and a loss from a partnership investment in "2401 San Jacinto Joint Venture" (San Jacinto) totaling $ 4,003. On Form 3468, Computation of Investment Credit, attached to petitioners' 1982 Federal income tax return, petitioners reported qualified investment in property eligible for investment tax credit of $ 219,189. Of this amount, $ 195,000 was attributable to the section 48(d)(1) election made by Jarelco. This was the only tax benefit claimed by petitioners on their 1982 tax return with respect to the reported Jarelco leasing activity. The balance of the qualifying investment was attributable to petitioner's Schedule C activity of practicing law and to rehabilitation credits from petitioners' Schedule E San Jacinto partnership investment. On their 1982 Federal income *135 tax return petitioners' precredit income tax liability of $ 15,954 was fully set off by the available investment tax credit (10 percent of the $ 219,189 investment in qualified property, or $ 21,919). The difference between these two amounts, $ 5,965, was carried back to petitioners' 1979 Federal income tax return and set off against the income tax reported on that return totaling $ 8,148.68. Petitioners' 1982 Federal income tax return was assigned to revenue agent Jacqueline C. Horgan (Horgan) in May 1986, to obtain an executed consent in order to extend the statute of limitations on assessment and collection of any deficiency for the taxable year 1982. At the time that petitioners' 1982 return was assigned to Horgan, that return was one of a batch of 150 tax shelter returns that Horgan received in one day in May of 1986, and whose 3-year limitation periods were about to expire in August or October of 1986. Horgan was charged with the responsibility of securing consents to extend the statute of limitations on these returns. Approximately 100 of the returns disclosed more than one tax shelter. Within one week of the receipt of the 150 returns, Horgan prepared and mailed requests *136 to extend the statute of limitations on all 150 returns. If no immediate reply was received from a taxpayer, Horgan sent a follow-up letter in approximately 3 weeks. In about 25-50 cases, Horgan was unable to get the statute of limitations extended. In such a case, she prepared a draft of a deficiency notice. The draft was then reviewed by a member of the Houston District Director's staff. Necessary changes, if any, were made. The District Director's reviewer then signed the notice of deficiency, which Horgan forwarded to the appropriate office for mailing. In addition to these duties, Horgan handled a normal assigned case load of around 25 cases. This was the largest work project that Horgan was assigned since she commenced working for the Internal Revenue Service in 1974. On May 16, 1986, Horgan mailed a printed form cover letter (Letter 907) signed by the Houston, Texas, District Director, a copy of Publication 1035 (Extending the Tax Assessment Period), and an original and copy of Form 872-A for the taxable year 1982 to petitioners. The Special Consent was unrestricted. Respondent requested in the form letter that petitioners sign the form extending the period of limitations *137 to assess tax in the event that unagreed adjustments were proposed to petitioners' 1982 return. The letter made no mention of items or entities disclosed on petitioners' 1982 return which respondent intended to examine. The letter also directed petitioners' attention to Publication 1035 for an explanation of taxpayers' rights and options with respect to respondent's request to sign the consent and suggested a telephone call to Horgan if further information was desired. The printed information on publication 1035 reads in part as follows: RESTRICTED CONSENTS In addition to extending the statutory period, consent agreements may also limit further examination or appeal activity to specific tax issues. These agreements are called restricted consents * * * We * * * consider the difficulties involved in accurately describing the scope of the restrictions when determining whether a restricted consent should be requested. * * *
Publication 1035 further advised petitioners that they had the "available options" of signing an unconditional consent, refusing to sign a consent, or to: -- negotiate consent items. The Internal Revenue Code does not provide for the length *138 of the extension period or the extent of examination or appeal activities which may be conducted. These decisions are left to the Service and the taxpayer, permitting negotiations between the parties. In addition to the tax issues contained in a restricted consent, the length of the extension period may be negotiated. Factors such as the type and difficulty of issues, whether an agreement is expected to be reached, etc., will be considered. Both parties must agree on the terms of the consent before it becomes effective, * * * After petitioners received Horgan's letter dated May 16, 1986, and its enclosures, petitioner telephoned David Bergeron (Bergeron) for advice concerning the agent's request. Bergeron had been petitioners' certified public accountant (CPA) since 1981. Bergeron is a tax accountant and graduated from Louisiana State University (LSU) in 1971. Bergeron is also an attorney, having graduated from LSU law school in 1974. He is a member of the Texas and Louisiana State Bars, but does not practice law. Presently, Bergeron is the managing partner for the Houston office of a regional CPA firm. Petitioner met with Bergeron in the CPA's office on June 9, 1986, *139 to discuss the meaning of the requested execution of a consent to extend the statute of limitations. [4] Bergeron told petitioner that if the Internal Revenue Service was interested in securing the extension because of petitioner's Jarelco investment, his past experience in handling tax shelters indicated that the shelter audits dragged on for an inordinate amount of time and cost an inordinate amount of money, due to additions to tax and interest. Bergeron therefore advised petitioner not to extend the statute of limitations if the inquiry on audit was Jarelco. *140 Petitioner instructed Bergeron to advise respondent's agent that petitioners would agree to extend the statute of limitations if the focus of the upcoming audit related to a non-Jarelco issue. Pursuant to instructions set forth in Horgan's form letter and Publication 1035, Bergeron thereupon telephoned Horgan, identified himself as the return preparer and asked her to state the focus of her audit. At the time of Bergeron's call on June 9, 1986, Horgan did not have a copy of a POA which would permit her to discuss petitioners' Federal income tax liability with anyone other than petitioners. Horgan had in her possession petitioner's 1982 Federal income tax return and Internal Revenue Service Form 6658 (Rev. 5-84), which is captioned Notice of Examination of Flow-through Activity (the notice). The information on this form included the year under examination (1982), the "flow-through entity" under examination (Jarelco), and the name and address of the flow-through entity investor under examination (petitioner). The notice also contained a space for a Tax Shelter Project code number and boxes designating the type of return under examination, i.e., partnership 1065, fiduciary 1041, *141 small business corp. 1120S, or "other". "Other" on the notice had been marked "Schedule C". In response to the CPA's telephone request that petitioners "wanted a restrictive consent", Horgan told Bergeron "that it was part of a tax shelter project and that after looking through the return, it appeared that that would be possible; that we would be using the general restrictive consent language. He indicated that he understood what I meant by that and that that would be acceptable to them". During the telephone conversation, any tax return information discussed was furnished by Bergeron, not by Horgan. Bergeron had asked Horgan "what (was) the scope of examination"? She replied "I asked him what -- about potential shelter activity that was on the return. I usually start with Schedule E, and so I was asking him, since I did not have a power of attorney, to tell me what he knew that was on the return". Upon being told that such activity (income or loss from rents, partnerships, etc.) was reported on Schedule E, Horgan agreed to limit the Special Consent to flow-through entities in accordance with "general restrictive language". Horgan completed the restricted Special Consent *142 after her telephone conversation with Bergeron. She mailed the Special Consent to petitioners, not Bergeron, on June 9, 1986. In preparing the Special Consent Horgan typed the restrictive language onto the printed Form 872-A based primarily on language contained in the Internal Revenue Service Manual (I.R.M.). This language is set forth in the I.R.M. under the general heading "Preparing Restricted Consents", published June 12, 1984. Horgan had the choice of selecting restrictive language from three generally similar I.R.M. paragraphs -- 2 Audit, Internal Revenue Manual (CCH), sec. 4541.72(4)(d), (e), or (f). An explanation of how these paragraphs may be used in preparing restrictive consents is set forth in part at I.R.M. section 4541.72(4)(d), as follows: The following restricted language may be used to include specific flow-through entities on the consent. The language in (e) and (f) below may be used to include all flow-through entities appearing on the return or all flow-through entities except specifically named flow-through entities, respectively. Except in unusual circumstances, the appropriate restrictive language provided in this paragraph, or in (e) or (f) below, *143 will be used on Form 872 or 872-A. The restrictive statement with the description of the areas of consideration is as follows: 1 small business corporation and partnership flow-through items to shareholder/partners * * * (a) the taxpayers' distributive share of any item of income, gain, loss, deduction, or credit of, or distribution from (list names of small business corporations and partnership(s) * * * on the taxpayer's return which are to be included * * * 2 small business corporation flow-through items to shareholders * * * and 3 partnership flow-through items to partners * * *. [I.R.M. 4541.72(4)(d).]
Similar provisions for listing names of appropriate entities to be included or excluded are set forth in paragraphs 2 and 3 above of I.R.M. section 4541.72(d). Cf. Southern v. Commissioner, 87 T.C. 49, 51 (1986) for an example of a consent drafted pursuant to the provisions of I.R.M. section 4541.72(d)3. Horgan selected restrictive language from I.R.M. section 4541.72(4)(e)1, involving small business corporation and partnership flow-through items to shareholders/partners, which paragraph may be used to include all flow-through entities appearing on *144 the returns. This paragraph does not require the listing of the flow-through entity(ies) to be examined by respondent as in I.R.M. section 4541.72(4)(d), or the listing of the flow-through entity(ies) to be excluded as in I.R.M. section 4541.72(4)(f). Sixteen words (the additional restrictive language), emphasized below, were copied onto the Special Consent from a separate sheet of paper that Horgan had in her tax shelter folder. The typed restrictive language added to the Form 872-A by Horgan reads as follows: The amount of any deficiency assessment is to be limited to that resulting from any adjustment to: (a) the taxpayer's distributive share of any item of income, gain, loss, deduction, or credit of, or distribution from any small business corporations, partnerships or organizations treated as partnerships on the taxpayer's tax return, trust, estate, nominee and any other entity from which tax attributes pass to or are properly reportable by taxpayer; (b) the tax basis of the taxpayer's interest in any of the above mentioned entities; and (c) any gain or loss (or the character or timing thereof) realized upon the sale or exchange, abandonment, or other disposition *145 of taxpayer's interest in any of the above-mentioned entities; including any consequential changes to other items based on such adjustment. [Emphasis Added.]
After petitioners received the Special Consent from Horgan, petitioner reviewed its terms with Bergeron. According to Bergeron, he reviewed the Special Consent language and believed that the restrictive language would not allow an audit of the election, under section 48(d)(1), by Jarelco, to treat petitioner as the owner of equipment for investment tax purposes. Bergeron made a point to review the Special Consent for such language, since his instructions from petitioners had been not to extend the statute of limitations if the Jarelco investment were the subject of the Internal Revenue Service's inquiry. Since Horgan had asked only about petitioners' Schedule E activities, Bergeron believed her inquiry to be directed to the San Jacinto partnership investment shown on petitioners' Schedule E, since no other items on petitioners' return gave rise to distributive shares in the year 1982, which were derived from flow-through entities. After reviewing the Special Consent, Bergeron opined to petitioner that the restrictive *146 language used confirmed his (Bergeron's) understanding of the parties' agreement to extend the statute of limitations for the year 1982, i.e., that the Special Consent restrictive language used by Horgan would not and was not intended to include an examination of the Jarelco-related investment credit. Bergeron therefore recommended to petitioner that petitioners sign the Special Consent. Bergeron called Horgan on July 8, 1986, and told her that petitioners would sign and mail to her the Special Consent. The Form 872-A was signed by petitioners on July 14, 1986, and by Horgan's group manager for respondent on July 18, 1986. Respondent mailed a statutory notice of deficiency to petitioners on July 21, 1987. The explanation in the notice of deficiency reads in part as follows: It is determined that you are not entitled to any Investment Tax Credit in the amount of $ 19,500.00 from Jarelco, a partnership [5], since it has not been established that any section 38 property has been acquired or placed in service in a trade or business by Jarelco partnership.
The investment tax credit (and additions to tax and additional interest) represent the only adjustments determined by *147 respondent and the only adjustments in dispute for the taxable year 1982. Discussion
Generally, income taxes must be assessed within three years after a return is filed. Sec. 6501(a). However, the taxpayer and the Commissioner may consent in writing to extend the 3-year period of limitations on assessment. Section 6501(c)(4) provides that "the period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon." Here, there is no dispute that the Special Consent (agreement) was executed by both parties prior to expiration of the statute of limitations for the year 1982 and that there was no termination of the Special Consent prior to issuance of the notice of deficiency. Assessment against petitioners with respect to 1979 and 1982 is barred unless: (1) The parties agreed to extend the period of assessment *148 beyond the date the deficiency notice was issued as to the adjustment in issue, or (2) petitioners are estopped to deny that the special consent extended the period of limitations as to such issue because of respondent's reliance on the Special Consent as drafted and executed. (1) Efficacy of the Special Consent
Petitioners argue that the Special Consent on its face did not extend the statute of limitations to the investment tax credit with respect to the section 48(d)(1) election made by Jarelco and claimed on their 1982 tax return. We agree. The general restrictive language selected by Horgan for the Special Consent was published in the I.R.M. on June 12, 1984. That language embodied the post-Subchapter S Revision Act of 1982 concept of an S corporation as a "flow-through entity" which passes through to the shareholders their distributive shares of Subchapter S corporate income, gain, loss, deduction, or credit. This language was effective as to S corporations for years commencing after 1982 and on its face did not apply to the 1982 investment tax credit derived from the section 48(d)(1) election. Petitioner was not a shareholder in Jarelco and only claimed the investment *149 tax credit because of his status as a lessee and Jarelco's election under section 48(d)(1). Respondent concedes that the restrictive language used by Horgan was recommended for flow-through entities involving years after 1982. However, he argues that its use was appropriate in this case. In support of his position, respondent argues that the term "distributive share" has "no special technical significance" and "concerns a fact * * * not an opinion or statement of law." We disagree. The meaning of that statutory term involves a matter of law, not a matter of fact. The phrase "distributive share" has been used in many sections of the Code in not only the 1982 year, but also in the Internal Revenue Code, as amended. [6]
*150 Respondent also suggests that there is an "ambiguity" in the Special Consent, arguing that "in the instant case any ambiguity in the restrictive language of the consent arises because of a conflict in meaning between the term 'distributive share' and the expanded language." Respondent does not advise us what this "conflict in meaning" is, although the Special Consent was drafted entirely by respondent from respondent's I.R.M. and a sheet of paper in respondent's agent's file. In Black's Law Dictionary 73 (5th ed. 1979), the term "ambiguity" is defined in part as follows: Language in contract is "ambiguous" when it is reasonably capable of being understood in more than one sense. (Citation omitted) Test for determining whether a contract is "ambiguous" is whether reasonable persons would find the contract subject to more than one interpretation. (Citation omitted) Ambiguity of language is to be distinguished from unintelligibility and inaccuracy, for words cannot be said to be ambiguous unless their signification seems doubtful and uncertain to persons of competent skill and knowledge to understand them. * * *
We perceive no ambiguity in the restrictive flow-through language *151 or the additional restrictive language incorporated onto the Form 872-A by Horgan. The language is unambiguous. Respondent further argues that even if the general restrictive language for flow-through entities from the I.R.M. is not applicable to an S corporation for the taxable year 1982, "the additional language * * * 'and any entity from which tax attributes pass to or are properly reportable by taxpayer' clearly broadens the scope of I.R.M. section 4541.72(4)(e)(1) to include all entities including lessor/Jarelco." Petitioners disagree. Petitioners maintain, inter alia, that the additional restrictive language of the Special Consent failed to extend the statute of limitations to include the 1982 Jarelco-related investment tax credit because of the provisions of section 48(d)(1) and its regulations. That section reads as follows: (1) GENERAL RULE. -- A person * * * who is a lessor of property may * * * elect with respect to any new section 38 property * * * to treat the lessee as having acquired such property for an amount equal to -- (A) * * * the fair market value of such property * * *.
Section 1.48-4(a)(1), Inc. Tax Regs., provides: If the conditions of this *152 subparagraph have been met, the lessee shall be treated as though he were the actual owner of all or a portion of the property for purposes of the credit allowed by section 38. Thus, the lessee shall be entitled to a credit allowed by section 38 with respect to such property for the taxable year in which he places such property in service, and the lessor shall not be entitled to a credit allowed by section 38 with respect to such property * * *
We agree with petitioners that the Jarelco-related investment tax credit does not fit within the additional restrictive language of the Special Consent. As indicated above, section 1.48(a)(1), Income Tax Regs., states that "the lessee shall be treated as though he were the actual owner of all or a portion of the property for purposes of the credit allowed by section 38." Tax attributes of an "owner" do not "pass", or are they "distributable" from any other person. We hold that the Special Consent's general restrictive language and its additional restrictive language, which did not restrict audit adjustments by name to Jarelco, do no encompass an audit of petitioners' Jarelco, do not encompass an audit of petitioners' Jarelco-related *153 investment tax credit. (2) Estoppel
Respondent, relying on Lignos v. United States, 439 F.2d 1365 (2nd Cir. 1971), contends that "petitioners are estopped to deny the validity of an agreement to extend the period of limitations where the respondent reasonably relied upon the Special Consent." The circumstances required for equitable estoppel to apply are: (1) there must be false representation or wrongful misleading silence; (2) the error must originate in a statement of fact, not in opinion or a statement of law; (3) the one claiming the benefits of estoppel must not know the true facts; and (4) that same person must be adversely affected by the acts or statements of the one against whom an estoppel is claimed. [Lignos v. United States, 439 F.2d 1365 at 1368]
See also Piarulle v. Commissioner, 80 T.C. 1035, 1044 (1983). Respondent contends that he relied on the validity of the Special Consent; that when Bergeron called Horgan, she was "under pressure to obtain a consent from petitioner"; that after the Special Consent drafted by Horgan was received by petitioners, neither petitioner nor Bergeron informed *154 Horgan that they "considered the restrictive language therein not to include adjustments to the Jarelco related ITC"; and that petitioners' failure to inform respondent of "any perceived mistake or ambiguity" in the Special Consent constituted wrongful misleading silence. Respondent's contention is simply not supported by the facts. The Special Consent was drafted with restrictive language by Horgan in response to Bergeron's request on June 9, 1986. She mailed the Special Consent to petitioners on the same day. The Special Consent contained I.R.M. and other language which referred generally to flow-through partnership and small business corporation entities. The flow-through language as to S corporations was ineffective as to Jarelco for the year 1982. Horgan used an I.R.M. form which did not identify Jarelco or any entity she intended to audit. She was not "under pressure" to secure a consent from petitioners the same day she talked to Bergeron three months before expiration of the statute of limitations. There is no evidence supporting respondent's assumption that petitioner and Bergeron "knew" Horgan intended to audit Jarelco. Horgan did not identify Jarelco in the Special *155 Consent language or during her telephone conversation with Bergeron. Moreover, petitioners were not obligated to advise respondent of an alleged error of law in respondent's own instrument with respect to identifying Jarelco when petitioners believed from the Horgan/Bergeron telephone conversation that the purpose of the consent was to limit the examination to Schedule E items. Cf. Cary v Commissioner, 48 T.C. 754, 765 (1967). Once Horgan drafted the Special Consent, there is no evidence that she later discussed the adequacy of the restrictive consent provisions with her supervisor, respondent's District Counsel, petitioners, or anyone else. We consider it surprising that respondent handled the negotiations concerning the drafting of this Special Consent in such a casual manner in view of respondent's restricted consent instructions to taxpayers in publication 1035, which state that respondent will "consider the difficulties involved in accurately describing the scope of the (Special Consent's) restrictions." Respondent's apparent failure to give this request for a Special Consent more than cursory consideration is in stark contrast to the attention given *156 by respondent's staff to cases where Horgan was unable to secure a consent extending the statute of limitations and notices of deficiency were issued. We agree with petitioners that any "misleading" was due to Horgan's failure to pay sufficient attention to the appropriate characterization of the Jarelco investment. Horgan herself may have been initially misled by the Form 6658. It stated "the investor in the above flow-through entity is located in your district and the Schedule K-1 is being sent for the following reason". As previously discussed, petitioner was not an investor in that he never owned stock in Jarelco, and no Schedule K-1 had been issued in his name. Finally, the record is devoid of a satisfactory explanation why Horgan, regardless of which I.R.M. form she used, failed to identify Jarelco as the entity she intended to examine. We note that, despite the mandatory tone in I.R.M. section 4541.72(4)(d) that "Except in unusual circumstances, the appropriate restrictive language * * * will be used on * * * Form 872-A," the provisions in the I.R.M. are directory rather than mandatory, and such procedures are not binding upon the Commissioner and convey no rights to taxpayers. *157 See First Federal Savings and Loan Association v. Goldman, 644 F.Supp. 101 (W.D. Pa. 1986). Nevertheless, even though respondent's agent was not required to use a form which disclosed the entity to be audited, her reasons for failing to identify Jarelco in the Special Consent are unsatisfactory. In response to petitioners' counsel's question "Are you aware that it is proper to name the investment by name in the restrictive consent?", Horgan replied that "Houston (District) Counsel much prefers not to" and since "they would prefer not * * * we normally don't do that." Respondent furnished no Houston District Counsel witness to support this internal rule, nor has respondent advanced a satisfactory reason, aside from Horgan's testimony, for the failure of the consent to identify Jarelco. The naming of the entity to be examined has been identified in consents discussed in numerous cases before us. Cf. Woods v. Commissioner, 92 T.C. 776, 780 (1989); Kronish v. Commissioner, 90 T.C. 684, 688 (1988); Southern v. Commissioner, 87 T.C. 49, 51 (1986); Piarulle v. Commissioner, 80 T.C. at 1038; *158 Kelly v. Commissioner, T.C. Memo. 1990-202; Russello v. Commissioner, T.C. Memo. 1989-391. We agree with petitioners that Horgan could have easily remedied the problem by inserting the word "Jarelco" in the Special Consent. Even though the drafted restrictive language did not encompass the 1982 Jarelco-related credit, petitioners would have been alerted as to respondent's audit intention. Horgan's failure to do so confirmed petitioners' understanding that the scope of the audit was limited to Schedule E partnership items. All of the facts were known by respondent when the Special Consent was drafted by his agent. Respondent must assume the responsibility of failing to adequately review the consent form to ascertain with certainty that it covered the Jarelco-related credit. Accordingly, petitioners are not estopped from relying on an instrument drafted by respondent which petitioners had reason to believe did not encompass an audit of their Jarelco investment tax credit. Petitioners' motion for partial summary judgment will be granted, and respondent's motion for partial summary judgment will be denied. An appropriate order will be *159 issued.
Footnotes
1. See Looney, v. Commissioner, T.C. Memo. 1988-332↩, in which this Court held that: (1) The Jarelco master recording lease venture was a generic tax shelter; (2) the venture lacked economic substance, and the taxpayers were not entitled to claim certain deductions, losses, or investment tax credits; (3) the taxpayers were liable for deficiencies and additions to tax under sections 6653(a) and 6659(a); and (4) the taxpayers were liable for the increased rate of interest provided in section 6621(c).
1. 10 percent of the underpayment attributable to the understatement of income tax ↩
2. 50 percent of the interest due on $ 13,536.00↩
2. In his objection to petitioners' motion, respondent conceded that the deficiency determined for the year 1980 is due to an investment tax credit carryback from the taxable year 1983 rather than 1982.↩
3. At the hearing on the parties' cross motions, the Court also heard argument on petitioners' motion to strike exhibits N, O, P, Q, and R, attached to respondent's objection to petitioners' motion for partial summary judgment, and respondent's objection to the granting of petitioners' motion to strike as to exhibits N, P, Q, and R. Since petitioners withdrew their motion to strike respondent's exhibits N, P, Q, and R, at the hearing and respondent had no objection to petitioners' motion to strike exhibit O, petitioners' motion to strike exhibits N, P, Q, and R, will be denied, and petitioners' motion to strike exhibit O will be granted.↩
4. At that meeting, Bergeron prepared, dated, and signed a Form 2848, Power of Attorney and Declaration of Representative (POA), for signature by petitioner and his wife, authorizing Bergeron to represent petitioners before the Internal Revenue Service with respect to Federal income taxes for the years 1979, 1980, 1981, 1982, 1983, and 1984. Petitioner took the POA home, where it was signed by him and his wife, dated June 11, 1986, and returned by mail to Bergeron. Bergeron mailed the POA to Horgan early in July 1986.↩
5. We note that respondent's notice of deficiency incorrectly referred to Jarelco as a partnership rather than a small business corporation.↩
6. The following is a non-exclusive list of Code sections defining "distributive share" which are the same in the Internal Code as applicable to the year 1982, and in the Internal Revenue Code, as amended: Section 61(a)(13) - Distributive share of partnership gross income Section 702(b) - Character of partnership distributive share Section 704(b) - Allocation of partner's distributive share Section 705 - Basis adjustment pursuant to partner's distributive share Section 706 - Allocation of partnership distributive share among taxable years Section 736 - Retiring partner's distributive share Section 6031(a) - Tax return for distributive share of partnership income↩