STEVEN R. NEWTON ET AL., APPELLEES, V. LESLIE T. BROWN ET AL., APPELLANTS, AND THE FEDERAL LAND BANK OF OMAHA, APPELLEE.

386 N.W.2d 424

Filed May 2, 1986.    No. 85-071.

Bert E. Blackwell, for appellants.

William T. Wright of Parker, Grossart, Bahensky & Wright, for appellees Newton et al.

BOSLAUGH, CAPORALE, SHANAHAN, and GRANT, JJ., and BRODKEY, J., Retired.

SHANAHAN, J.

Leslie and Anna Brown appeal the judgment of the district court for Red Willow County, reforming their deed to the north half of Section 22, Township 2 North, Range 28 West of the 6th P.M., in Red Willow County, Nebraska, to conform with a contract for the sale of that real estate. We affirm.

A proceeding to reform a written instrument is an equity action. *Hohneke v. Ferguson*, 196 Neb. 505, 244 N.W.2d 70 (1976). On appeal to the Supreme Court, an equity action is a trial de novo on the record, requiring this court to reach a conclusion independent of the findings of a trial court but subject to the rule that, where credible evidence is in conflict on material issues of fact, the Supreme Court will consider the fact that the trial court observed the witnesses and accepted one version of the facts over another. See, Neb. Rev. Stat. § 25-1925 (Reissue 1979); *In re Estate of Lienemann, ante* p. 169, 382 N.W.2d 595 (1986).

Originally, Marie Esch owned the half section described in Brown's reformed deed, which was subject to a lease for oil and gas production. According to the producers' unit agreement for Section 22, there were four producing oil wells on Marie's half section. Marie's son-in-law, Herbert Newton, farmed the land as her tenant. In 1970 Herbert and his wife, Betty, sold their south half of Section 22, adjacent to Marie's half section, to Leslie and Anna Brown but reserved the mineral rights on that half section until 1977. Herbert and his family moved to Indiana in 1971. Marie died in 1972. Each of Herbert's three children—Steven E. Newton, Diana Newton Norman, and Regina C. Newton—inherited an undivided one-third interest in their grandmother Marie's half section. Because Regina's age was then 5 years, Herbert became guardian for Regina. Herbert managed his children's inherited half section, which was thereafter leased to the defendant Leslie Brown. When Brown became the Newton children's tenant, oil wells were still

producing on the half section, and Brown knew the Newton children were receiving royalties from oil companies as mineral lessees. For oil production on their half section, the children monthly received two royalty checks, one from Husky Oil and the other from Koch Oil Company.

Herbert periodically inspected his children's farm in Nebraska. On one such occasion, in the fall of 1975 at the McCook sale barn, Herbert visited with Leslie Brown about Brown's possible purchase of the children's farm, but no terms for a sale were reached. When he was back home in Indiana, Herbert telephoned Brown in January 1976 concerning a possible sale of the children's half section. Herbert suggested a price of $155,000 but told Brown "[n]o oil or mineral or gas rights would go with it [the children's half section]; that was the desire of their grandmother that [sic] would never be sold." Brown said he would "think it over."

During a March visit to Nebraska, Herbert met Brown and his wife, Anna, at a McCook restaurant, where the Browns and Herbert agreed, generally, on terms for a sale of the children's land. After Herbert had contacted his son, Steven, and his daughter, Diana, who lived in Kearney, all parties convened on the morning of March 30, 1976, in the office of Herbert's attorney. While the attorney was reading aloud a proposed and typed draft of the contract, namely, a provision that the "sellers reserve all oil, gas, mineral rights in or under the ground as long as production exists," Anna Brown remarked: "I don't like that in or under the ground." Anna Brown further commented: "If we were to drill an irrigation well, we would have to pay those kids for the water." The attorney reassured Anna that the reservation did not relate to water of the tract being acquired, but Anna stated that she would not sign any contract, unless the phrase "or under the ground" was deleted.

The attorney directed his secretary to retype the contractual provision regarding the mineral reservation, the phrase "or under the ground" was deleted, and the retyped contract contained the following:

## RESERVATIONS

The sellers expressly reserve unto themselves all of the oil, gas and mineral interests in said real estate as long as

production exists.

The parties, including Herbert, as guardian for Regina, signed the revised contract which, among its other terms, specified a purchase price of $155,000, namely, $65,000 to be paid as soon as Browns obtained a loan from the federal land bank; $60,000 due on September 1, 1976; and $30,000 as a final installment payment of the purchase price. Immediately after signing the revised contract and as provided in that written agreement, Herbert, again as guardian for Regina, and the Newton children executed a warranty deed for conveyance of the children's half section to the Browns. The deed did not contain any reservation of mineral interests. When they signed the contract and, subsequently, the deed, the parties never noticed the discrepancy between the contract and the deed, that is, omission of the mineral reservation from the deed. The attorney informed the parties that the signed contract and executed deed would be kept in escrow at a McCook bank pending payment out of proceeds received by Browns from their federal land bank loan. Neither Herbert nor his children received a copy of the contract and deed. On June 10, 1976, Browns obtained a loan from the federal land bank, made a part payment to the Newtons from such loan proceeds, and received their deed to the Newton children's half section. Also, Browns gave Newtons a real estate mortgage as collateral for the unpaid balance of the purchase price, which mortgage was subordinated to the federal land bank mortgage and was due in September 1982. Browns recorded their deed on July 1, 1976.

Husky Oil and Koch Oil Company continued to issue monthly checks to the Newton children in payment of royalties from the producing wells on the half section acquired by Browns. Regina's royalty payments were placed in certificates of deposit at a minimum annual rate of interest at 10.5 percent, while royalties paid to Diana were placed in a "cash management fund" paying interest at a minimum rate of 10 percent per annum. Browns farmed the half section after their acquisition in 1976 and on September 1, 1982, made their last payment for the Newton land. On February 10, 1983, the attorney who had prepared the contract and deed on March 30, 1976, died.

In early March 1983 Steven, who had moved to Kansas, contacted a Kansas bank to obtain a loan for which his oil royalties from the half section would be collateral. The bank balked at accepting Steven's royalty payments as collateral because the deed given to Browns did not contain any mineral reservation in favor of Steven or his sisters. Steven telephoned Herbert about the omission of any mineral reservation in the Brown deed. Steven also contacted Browns about the mineral reservation discrepancy involving the contract and deed, and sought a quitclaim deed from Browns regarding the mineral interests on the half section. Browns declined to sign that quitclaim deed. Herbert returned to Nebraska in an attempt to correct the situation. On March 15 Browns' attorney, by letter to Koch Oil Company, demanded that future payment of royalties be made directly to Browns. In response to that letter Koch Oil Company, in March 1983, suspended all payment of royalties "until such time as the dispute between the various parties is resolved." From 1976 to March 1983 the wells on the half section produced 1,328,410 barrels of oil (a barrel equals 42 gallons), and Koch Oil Company paid royalties of $108,364 to the Newton children. Between September 1, 1982, and March 1983, there were 72,381 barrels pumped from the half section, resulting in royalty payments of $14,308 to the Newton children.

Later in 1983, Herbert as guardian for Regina, Steven, and Diana filed suit against Browns, seeking that the warranty deed to Browns be reformed to include the mineral reservation contained in the March 30, 1976, contract of sale, which reservation had been omitted through alleged mutual mistake of the parties. As a second cause of action in their petition, Herbert and his children requested that Browns be charged with interest on account of Browns' action in causing suspension of royalty payments from Koch Oil Company. In their amended answer the Browns acknowledged execution of the March 30, 1976, contract and deed, but denied any mistake in the deed given by the Newton children. As an affirmative defense, Browns alleged that the statute of limitations, Neb. Rev. Stat. § 25-207 (Reissue 1979), barred the remedy of reformation.

George Fisher, a "terrible good friend" of Leslie Brown and

87 years old, testified for the Newton family. Sometime before Brown had purchased the half section from the Newton children, Fisher had sold a farm to Brown. In "kidding" with Brown during a conversation within a few months after the Newton sale in 1976, Fisher said that Brown had "treated [the Newton children] a little better than you did me," referring to the fact that, in the Fisher-Brown sale, Fisher retained only one-half of the mineral rights. In response, Brown stated that, while he had been renting from the Newtons, he had known the Newton children were receiving royalties and that as a part of the sale to Brown "[the Newton children] keep all of the mineral rights; they kept it all." In another and subsequent conversation, Brown mentioned to Fisher, "I'll never get the oil, any oil on it. They kept it as long as there is any oil . . . . The kids kept their oil as long as there was any oil there for production."

In the course of his testimony, Leslie Brown admitted that his first notice of any discrepancy between the contract and the deed came from Steven Newton in March 1983. In reference to the sale from the Newton children, Leslie Brown testified "the Newton children would keep the mineral rights for as long as production existed" and that in acquiring the children's half section, Brown was interested in a "place to live. I wasn't interested in the oil."

Anna Brown testified that her notice of the discrepancy between the contract and deed came from Steven Newton in 1983 and acknowledged that Herbert Newton's attorney "may have" changed the "wording of the clause," referring to the mineral reservation contained in the initial draft of the contract on March 30, 1976. Leslie and Anna Brown testified that they believed all mineral rights became theirs when the warranty deed was delivered to them.

Payment of royalties suspended by Koch Oil Company from March 1983 until trial in September 1984 were $41,480 for the half section Browns acquired from the Newton children.

The district court concluded that when the contract and deed were signed on March 30, 1976, it was the intention of the parties that the "sellers would reserve unto themselves the oil, gas and mineral rights in [the half section] as long as production

exists" and "the intention of the parties was correctly expressed in the contract but through an error and oversight of the scrivener was not correctly expressed in the deed." The court entered judgment reforming the deed, namely, that the deed "be reformed to contain the following reservation: 'Sellers expressly reserve unto themselves all of the oil, gas, and mineral interests in said real estate as long as production exists.' " Additionally, the district court, in view of its disposition by reformation, entered judgment that the "Plaintiffs have been deprived of the use of the oil royalty money from Koch Oil Company" and ordered Browns to pay $789.98 to each of the Newton children as interest on the suspended and unpaid royalties.

Browns allege the district court erred in (1) granting reformation and (2) awarding interest on unpaid royalties from Koch Oil Company.

Equitable relief by reformation depends on whether an instrument to be reformed expresses the intent of the parties. The remedy of reformation is designed to correct an erroneous instrument and, by such correction, reflect the real intent of the parties regarding that instrument. See *Waite v. Salestrom*, 201 Neb. 224, 266 N.W.2d 908 (1978). In situations involving a sale, an equitable proceeding to reform an instrument, such as a written contract for sale of real estate, serves to recover for a seller something "from which [the seller] did not intend to be parted." 6A. R. Powell, The Law of Real Property ¶ 894 at 81-115 (1984).

Reformation is based on the premise that the parties had reached an agreement concerning an instrument, but while reducing their agreement to a written form, and as the result of mutual mistake or fraud, some provision or language was omitted from, inserted, or incorrectly stated in the instrument intended to be an expression of the actual agreement of the parties. See, *Schweitz v. State Farm Fire & Cas. Co.*, 190 Neb. 400, 208 N.W.2d 664 (1973); Restatement (Second) of Contracts § 155 (1981). In some instances reformation may be granted where there is unilateral mistake on one side and fraud or inequitable conduct on the other. See, *Johnson v. Stover*, 218 Neb. 250, 354 N.W.2d 142 (1984); *Waite v. Salestrom, supra*.

However, the case before us involves a claim of mutual mistake. Before reformation of an instrument will be allowed, the party seeking such reformation on a claim of mutual mistake must, by clear and convincing evidence, prove existence of such mistake in reference to the instrument to be reformed. *Johnson v. Stover, supra*; *Cunningham v. Covalt*, 204 Neb. 512, 283 N.W.2d 53 (1979). Clear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved. *In re Estate of Lienemann, ante* p. 169, 382 N.W.2d 595 (1986); *Castellano v. Bitkower*, 216 Neb. 806, 346 N.W.2d 249 (1984).

For the purpose of reformation, when is a mistake mutual? A mutual mistake is a belief shared by the parties, which is not in accord with the facts. See Restatement (Second) of Contracts § 151 (1981). A mutual mistake is one common to both parties in reference to the instrument to be reformed, each party laboring under the same misconception about their instrument. *Kear v. Hausmann*, 152 Neb. 512, 41 N.W.2d 850 (1950). "A mutual mistake exists where there has been a meeting of the minds of the parties and an agreement actually entered into, but the agreement in its written form does not express what was really intended by the parties." *Sierra Blanca Sales Co., Inc. v. Newco Industries, Inc.*, 84 N.M. 524, 530, 505 P.2d 867, 873 (1972).

If incorrect language or wording is inserted by mistake, including a scrivener's mistake, into an instrument intended to reflect the agreement of the parties, such mistake is mutual and contrary to the real intention and agreement of the parties. See *Lippire v. Eckel*, 178 Neb. 643, 134 N.W.2d 802 (1965). As a corollary of the foregoing principle, an erroneous omission or deletion, even by a scrivener, from an instrument intended to reflect the agreement of the parties is a mutual mistake and is contrary to the real intention and agreement of the parties. See *Thompson v. Bantz*, 136 Mont. 210, 346 P.2d 982 (1959) (reformation of a warranty deed, where a scrivener inadvertently and mistakenly omitted from a deed a reservation of a mineral interest specified in the contract for the deed reformed).

"The fact that one of the parties . . . denies that a mistake was made does not prevent a finding of mutual mistake nor prevent reformation." *Olds v. Jamison*, 195 Neb. 388, 393, 238 N.W.2d 459, 463 (1976). In *Lippire v. Eckel, supra*, we stated: " 'The negligent failure of a party to know or to discover the facts, as to which both parties are under a mistake does not preclude . . . reformation . . . .' " *Id*. at 649, 134 N.W.2d at 806-07.

Approximately 6 years before Browns' purchase from the Newton children, Herbert had sold a half section to Browns and reserved the mineral interests in the land sold, although that mineral reservation was restricted to a definite duration. Consequently, when the parties signed the contract on March 30, 1976, at least Herbert and the Browns were conversant with terminology for a reservation of mineral interests. During the conference at the attorney's office on March 30, Anna Brown inquired about the effect of the "RESERVATION" contained in the initial draft of the contract and objected to the phrase "or under the ground," apparently concerned that such phrase would constitute an impediment to irrigation operations on the land being acquired from the Newton children. At Anna's insistence the redrafted "RESERVATION" excluded the phrase troublesome to Anna. None of the parties dispute that their intent, as expressed by the written contract, included a reservation of mineral interests in favor of the Newton children. In an apparent atmosphere and setting of shuffling papers, reading instruments aloud to the parties, instructing a secretary about revisions in the initial draft of the contract—all with the parties in the attorney's office, awaiting signatures on instruments to conclude formalities of the sale—the attorney-scrivener failed to secure conformity between the written agreement and the deed given pursuant to that agreement. The mutual mistake occurred when the Newton family gave and Browns received the deed under the mutually mistaken belief by the parties that the deed corresponded to their uncontradicted contractual provisions.

During Leslie Brown's conversation with his neighbor, George Fisher, who had also sold real estate to Brown subject to a mineral reservation, Brown acknowledged the extent of the mineral interest reserved by the Newton children, namely: "The kids kept their oil as long as there was any oil there for

production." That acknowledgment underscored Brown's own testimony: "[T]he Newton children would keep the mineral rights for as long as production existed."

Although Leslie Brown had stated he "wasn't interested in the oil," at least near the time of the sale by the Newton children, perhaps 7 years' rhythmic rocking of the horse's head changed his mood about the crude. (A "horse's head" is the extremity of a pumping unit's walking beam, or crossbeam, above a well, moving up and down in pumping oil from the well.) Nevertheless, it is significant that, before the claim about the mistake in the deed, the Browns never sought any payment of royalties, especially from September 1, 1982 (when the purchase price had been paid in full to the Newton children), until March 1983 (when Browns demanded that Koch Oil Company pay the royalties to them, after their contact with Steven Newton about the mistake in their deed). Such inaction by Browns during known oil production on their land speaks loudly in support of the mineral reservation in favor of the Newton children.

The evidence clearly and convincingly establishes existence of a mutual mistake, namely, the parties erroneously believed that the deed conformed with their unequivocal and uncontradicted agreement regarding reservation of mineral rights by the Newton children. As a result of our de novo review of the record, we reach the only reasonable conclusion, the same as did the district court—the deed to Browns must be reformed to coincide with the agreement of March 30, 1976, regarding the reservation of mineral interests in favor of the Newton children.

Although the contract and deed were executed on March 30, 1976, the discrepancy between the two instruments was not discovered until March 1983. The relevant statute of limitations, § 25-207, provides: "The following actions can only be brought within four years: . . . an action for relief on the ground of fraud, but the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud . . . ."

In *Ainsfield v. More*, 30 Neb. 385, 46 N.W. 828 (1890), this court noted "mistake" was not included in a statutory predecessor of § 25-207, but held "these three, fraud, accident,

and mistake, have been always classed together as the three great fountains of equity jurisprudence." 30 Neb. at 403, 46 N.W. at 834. Relying on *Ainsfield*, this court in *Sweley v. Fox*, 135 Neb. 780, 284 N.W. 318 (1939), held that the then existing statute of limitations concerning reformation of an instrument, which was substantially the same as the present § 25-207, contained a discovery rule, namely:

> If the fraud or mistake ought to have been discovered, and would have been if reasonable diligence had been exercised by the plaintiff, the statute will run from the time such discovery ought to have been made, for a plaintiff cannot excuse delay in instituting suit of his cause of action if his failure to discover it is attributable to his own neglect.

*Id.* at 785, 284 N.W. at 320-21.

From 1976 until 1983 nothing transpired to alert the parties about the discrepancy between the contract and deed. Browns farmed their land and made their loan payments, and the Newton children continued to receive royalties from the oil producers on Browns' real estate. We find nothing from the conduct of any parties or attendant circumstances which indicates that the mutual mistake was discoverable by reasonable diligence before such mistake was actually discovered in 1983. The action was not barred by § 25-207.

Browns suggest delivery of the deed caused a merger, that is, all prior negotiations for the sale of the half section were merged in the deed given by the Newton family. As expressed in *Union Pacific Land Resources Corp. v. Park Towne, Ltd.*, 212 Neb. 83, 87, 321 N.W.2d 440, 443 (1982): " ' "[U]pon the execution, delivery, and acceptance of an unambiguous deed, such being the final acts of the parties expressing the terms of their agreement with reference to the subject matter, all prior negotiations and agreements are deemed merged therein . . . ." ' " However, in *Bibow v. Gerrard*, 209 Neb. 10, 13, 306 N.W.2d 148, 150 (1981), we held: "[T]he doctrine of merger does not apply where there has been fraud or mistake." As we have previously concluded, there is mutual mistake established by the facts in the present case. Therefore, the doctrine of merger is inapplicable in the present proceedings.

The Browns' second assignment of error is directed to the district court's order that interest be paid to the Newton children for the royalties which were suspended due to Browns' demand on Koch Oil Company. From March 1983 until trial, royalties which Koch Oil Company would have paid the Newton children, were it not for Browns' demand resulting in suspension of payments by Koch, amounted to $41,480. Whatever other means might have been utilized regarding Koch Oil Company as a stakeholder, Browns, nevertheless, sought to obtain direct payment of royalties to them.

As this court acknowledged in *Mid-States Equipment Co. v. Poehling*, 204 Neb. 791, 795, 285 N.W.2d 689, 691-92 (1979):

"Nevertheless, interest is sometimes allowed by courts of equity, in the exercise of a sound discretion, when it would not be recoverable at law. These courts, it has been said, will, in their discretion, allow or withhold interest as, under all the circumstances of the case, seems equitable and just, except in cases where interest is recoverable as a matter of right."

In 47 C.J.S. *Interest & Usury* § 6 at 28 (1982) it is stated:

Interest is charged not only because of the value to the one who uses money, but also as compensation to the one who has been deprived of the use of money. Interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness; it is denied when its exaction would be inequitable.

There were approximately 19 months during which the Newton children did not receive their royalty payments, which had been interrupted as the result of Browns' demand letter. Browns must be held to account for suspension of those royalty payments. Reformation alone will not provide a remedy accomplishing equity under the circumstances. To avoid an inequitable, and therefore unjust, result, interest on the detained royalties is an equitable solution.

A judicial abuse of discretion does not denote or imply improper motive, bad faith, or intentional wrong by a judge, but requires the reasons or rulings of a trial judge to be clearly untenable, unfairly depriving a litigant of a

618

·substantial right and denying a just result in matters submitted for disposition through a judicial system. *Bump v. Firemens Ins. Co.*, 221 Neb. 678, 689, 380 N.W.2d 268, 276 (1986).

We find no abuse of discretion by the district court in awarding interest under the circumstances.

The judgment of the district court is, therefore, affirmed.

AFFIRMED.