REQUESTED BY: Mary Jane Egr, State Tax Commissioner
You have requested an official opinion concerning a claim for ethanol production credits filed by one of the state's "expansion gallon" ethanol producers pursuant to Neb. Rev. Stat. § 66-1344
(4) (1996).
BACKGROUND
As set forth in your correspondence, the background of this issue is as follows:
 In August of 1992, the State of Nebraska (through the Nebraska Department of Revenue) entered into an Ethanol Production Credit Agreement with Minnesota Corn Processors (hereinafter "MCP"). . . . The contract provided that the original name plate design capacity (the original designed capacity of an agricultural production facility specified in gallons of ethanol produced per year) for MCP's ethanol production facility was thirty million gallons and that MCP would be eligible to receive production credits under the program through December 31, 1997.
 On June 30, 1994, MCP completed an expansion of its ethanol facility which increased its production capability. This led to the State and MCP executing an amendment to the prior agreement in February of 1997. It provided that the name plate design capacity for the plant had increased to eighty million gallons because of the plant expansion. Furthermore, it extended the period for which MCP would be eligible to claim credits under the program where it stated: "MCP will be eligible to receive tax credits for ethanol produced by the ethanol production facility through June 30, 1999." . . .
[This] Paragraph . . . was drafted in accordance with Neb. Rev. Stat. § 66-1344(4), which provided:
 Any ethanol facility eligible for a credit under subsection (1), (2) or (3) of this section shall also receive a credit of twenty cents per gallon of ethanol produced in excess of the original name plate design capacity which results from expansion of the facility completed on or before December 31, 1995. Such credit shall be for sixty months beginning with the first month for which production from the expanded facility is eligible to receive such credit and ending not later than December 31, 2000. (Emphasis added).
You have also informed us that it is the interpretation of the Department of Revenue, as the administering agency, that the sixty month eligibility period referenced in § 66-1344 commences upon the satisfaction of two conditions by an ethanol producer. The first is the completion of plant expansion and the second is the production of enough ethanol to surpass its original name plate design capacity.
MCP completed its plant expansion on June 30, 1994, and surpassed its original name plate design capacity sometime in September of 1994. However, the production agreement between MCP and the State contains a provision stating "MCP will be eligible to receive tax credits for ethanol produced by the ethanol production facility through June 30, 1999." In other words, the agreement calculated the sixty months from the date of the completion of the plant expansion (in accordance with the parties' understanding of the controlling statute at that time) rather than from the date the second criteria was satisfied (production of enough ethanol to surpass the original capacity) as the parties now agree the statute provides.
The legal issue then, is whether MCP is bound by the June 30, 1999, cutoff date in the agreement, or whether MCP may collect expansion credits through September 1999 as the parties agree is authorized by the statute, and which would be consistent with the treatment of other ethanol producers. The difference in dates affects approximately three million dollars of credits.
 DISCUSSION
Our initial reaction to this question is that MCP signed a contract containing a June 30, 1999, cutoff date, and must abide by this agreement. The plain terms of the contract provide for the production credit period to end on June 30, 1999. Unambiguous language is not open to construction and normally such clear language is dispositive of the parties' intent. Schrempp andSalerno v. Gross, 247 Neb. 685, 529 N.W.2d 764 (1995). The matter is not this simple, however. There is no question but that the parties actually intended to contract for the maximum allowable period for production credits. There are legal issues as to whether the Director had authority to contract with MCP for a period shorter than the statutory period, and whether the erroneous calculation of the credit cutoff date by the parties is correctable as a mutual mistake.
Under Nebraska law, statutes in existence at the time of the execution of a contract become part of the contract as if set forth therein. In re Estate of Paterson, 221 Neb. 792,381 N.W.2d 109 (1986). In this case, Neb. Rev. Stat. § 66-1344(2) provided: "[s]uch credit shall be for sixty months beginning with the first month for which production from the expanded facility is eligible . . . " (emphasis added). Thus, it is arguable that the Director had statutory authority to enter contracts only for a full sixty months after eligibility was established, and not for a shorter time. See Scotts Bluff County v. State, 133 Neb. 508,276 N.W. 185, 188 (1937). The questionable legitimacy of a contract for less than sixty months also lends credence to the argument that the erroneous cutoff date used in the agreement constitutes a mutual mistake by the parties which could be "reformed" or corrected by a court. "Reformation is based on the premise that the parties had reached an agreement concerning an instrument, but while reducing their agreement to a written form, and as a result of mutual mistake . . . some provision or language was . . . incorrectly stated in the instrument intended to be an expression of the actual agreement of the parties." Newton v. Brown,222 Neb. 605, 612, 386 N.W.2d 424, 429 (1986).
Based on our review of the applicable statutes and case law, as they apply to this particular set of facts, it is our opinion that a court would find MCP to be eligible under Nebraska law to receive ethanol expansion credits for a period of sixty months after eligibility was established, rather than the date mistakenly used in the agreement.
Sincerely,
 DON STENBERG Attorney General
 Steve Grasz Deputy Attorney General
Approved by:
_______________________________ Attorney General