Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/03/2026 08:07 AM CDT

In re Estate of Paul A. Knapp, deceased.

Barbara Knapp, appellant, v. Lance Knapp,
Personal Representative of the Estate
of Paul A. Knapp, deceased, appellee.

___ N.W.3d ___

Filed April 3, 2026.    No. S-24-619.

1. **Contracts: Judgments: Appeal and Error.** The meaning of a contract is a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below.

2. **Equity: Contracts: Specific Performance: Decedents' Estates: Appeal and Error.** An action to compel specific performance of an oral contract to devise real property by will is equitable in nature and is reviewed by an appellate court de novo on the record.

3. **Appeal and Error.** In a de novo on the record review, an appellate court makes findings independent of the trial court; however, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

4. **Words and Phrases.** An ambiguity is an uncertainty of meaning based not on the scope of a word or phrase but on a semantic dichotomy that gives rise to any of two or more quite different but almost equally plausible interpretations.

5. **Reformation.** Reformation is based on the premise that the parties had reached an agreement concerning an instrument, but while reducing their agreement to a written form, and as the result of mutual mistake or fraud, some provision or language was omitted from, inserted, or incorrectly stated in the instrument intended to be an expression of the actual agreement of the parties.

6. **Reformation: Evidence: Proof.** Before reformation of an instrument will be allowed, the party seeking such reformation on a claim of mutual mistake must, by clear and convincing evidence, prove existence of such mistake in reference to the instrument to be reformed.

7. **Wills.** Under Neb. Rev. Stat. §§ 30-2327 to 30-2329 (Reissue 2016), wills must be in writing.

8. **Contracts: Specific Performance: Decedents' Estates: Proof.** In an action for specific performance of an oral agreement with a deceased person to convey land, one trying to enforce such a contract must prove (1) an oral contract the terms of which are clear, satisfactory, and unequivocal and (2) that the thing done constituting performance is such as is referable solely to the contract sought to be enforced, and not such as might be referable to some other or different contract.

Appeal from the County Court for Dodge County: Francis W. Barron III, Judge. Affirmed.

Mary L. Hewitt, of McGill, Gotsdiner, Workman & Lepp, P.C., L.L.O., for appellant.

Sheila A. Bentzen, of Rembolt Ludtke, L.L.P., for appellee.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Bergevin, J.

## INTRODUCTION

Barbara Knapp appeals from the county court's order disallowing, in part, her claims against the estate of her husband, Paul A. Knapp. In dispute are her claims for proceeds from the sale of their marital residence and for a statutory maintenance fund.[1] Barbara's claims arise out of her and Paul's premarital agreement and a purported subsequent oral agreement between them. We affirm.

## BACKGROUND

Paul was previously married to Diane Knapp, and their marriage produced two children, including Lance Knapp, the

---

[1] See Neb. Rev. Stat. §§ 30-2324 and 30-2325 (Reissue 2016).

personal representative of Paul's estate. In 2010, Paul executed a will leaving his property, less a few personal items, to Diane. In the event Diane predeceased Paul, his property was to be split between his children and grandchildren. Diane predeceased Paul in 2011. The parties do not dispute that Paul did not revoke that will or execute a subsequent will[2] before his own death in April 2023. Lance, as personal representative of Paul's estate, filed an action in the county court to probate Paul's 2010 will. Barbara filed various claims against Paul's estate in that action. Lance disallowed the claims, and the matter proceeded to trial. The only two claims at issue concerned the marital residence and a statutory maintenance fund.

## MARITAL RESIDENCE REMODEL

After Diane's death, Paul and Barbara began dating and eventually got engaged to be married. In anticipation of marriage, the couple agreed that Barbara would sell her home and that they would reside in Paul's home, which would be remodeled. They chose Paul's home because it had "less stairs," and both of them were having knee issues. Paul had wanted to remodel his home for some time, and Barbara testified that he had asked her to contribute funds for the remodel. The remodel included a full build-out. As Lance described the remodel, "It was a house added onto a house," and included, among other things, the addition of a primary bedroom to the first floor of the home and a sewing room for Barbara. The construction of the remodel began in 2015 or 2016 and was completed by the time the couple married in October 2016. However, at the time they married, all the related invoices had not yet been received, paid, or both.

## PREMARITAL AGREEMENT

In September 2016, the month before they married, Paul and Barbara, both represented by counsel, executed a premarital

---

[2] See Neb. Rev. Stat. § 30-2332 (Reissue 2016).

agreement.[3] Specific relevant provisions of the agreement are set forth below, but, generally, Paul and Barbara agreed that their separate property would remain separate. The disclosures of their separate property were incorporated into the agreement.[4]

Relevant here, Paul and Barbara each disclosed that they owned their respective personal residences. Paul's disclosure also listed a loan from Barbara of approximately $31,000 as a liability. Barbara testified that the loan was for Paul's credit card debt because they did not want to carry that debt into the marriage. Both of them had agreed that the funds were a loan, not a gift, and Paul eventually repaid the debt in full.

Barbara's counsel drafted the premarital agreement. It provided, generally, that separate property included "[a]ll properties so belonging to the party as of time of marriage to the other party," and separate property "shall cease" to be separate property if one of them transferred title to both of their names as joint tenants with rights of survivorship. Article VII of the premarital agreement covered the parties' separate property rights. It provided that "[e]xcept as specifically provided to the contrary elsewhere," both Paul and Barbara would remain "the sole owner of . . . all Separate Property of any kind owned by such party at any time" and that upon their deaths,

> the Separate Property of the deceased spouse shall descend to and vest in the deceased spouse's beneficiaries, heirs at law, distributees, legatees, or devisees, and in such manner as may be prescribed by his or her Last Will and Testament, Codicil, Trust, title, or beneficiary designation (or in absence of such designations, by the statutory laws

---

[3] See Neb. Rev. Stat. § 36-202 (Reissue 2016) ("every agreement, promise or undertaking made upon consideration of marriage" shall be void unless in writing and subscribed).

[4] See Neb. Rev. Stat. § 30-2316 (Reissue 2016) ("fair and reasonable disclosure of the property [and] financial obligations").

then in force), all as though no marriage had ever taken place between them.

The particular issue in this appeal concerns "Article XI[:] Control and Management of Property," and its cross-reference to "Article 9.4" (article 9.4). Article XI provided that each party had the "full right to own, control, manage, and dispose of his or her Separate Property" and that they each had the "full right to encumber, sell, give away, or otherwise dispose of any property owned by such party without the consent of the other party." The article also provided that they were each "free to provide for disposition of their own estate at time of death in any way that he or she wishes and to anyone that he or she wishes."

Finally, and most relevantly, the article provided that the survivor of the two of them had "no claim against the estate of the other" based on their relationship as husband and wife, "[e]xcept for property which is titled between the two parties as joint tenants with rights of survivorship, and *the provisions regarding the personal residence, maintenance fund, and vehicle as set forth in Article 9.4 above*." (Emphasis supplied.) However, the premarital agreement does not contain an "Article 9.4."

In response to a subpoena for documents, Barbara's counsel produced only a few documents, purportedly due to a merger of law firms, which caused the loss of documents. None of the produced documents specifically addressed article 9.4 or its intended contents, if any.

### ORAL AGREEMENT

Paul's friend testified that Paul stated on multiple occasions that after the remodel, Barbara would receive 40 percent of the marital residence. The first time was when Paul and Barbara were beginning the "project of adding onto the house and they were talking about marriage and things like that." And the last time was "within a month before [Paul] passed." As he put it: "[Paul] had told me that everything was taken

care of. It was going to be 60/40 and everybody knew it. . . . The house would be 60/40, and [Barbara] could stay there as long as she wanted." Paul iterated this agreement "when they got married, when they were building, [and] when Barb sold her house. It was repeated."

Barbara testified that when she and Paul were preparing their premarital agreement, they had agreed that

> I would try to pay half of — or close to half of whatever needed to be paid in the house. And he would do the same. And after the — if something happened to either of us, we would stay in the house for as long as we wanted. And then the house would be split.

However, she was "not sure [they] said 60/40 yet." She testified that they reached that agreement "probably — I think around the time that I sold my house. So, that was in 2017."

Barbara asserted that she fulfilled her side of the agreement with Paul and that she "tried to contribute everything [she] could." Accordingly, she contended that because Paul predeceased her, she "could stay there as long as [she] wanted," and that she was entitled to receive 40 percent of the proceeds upon the sale of the marital residence.

Barbara adduced expenses related to the remodel that she paid between July 2016 and November 2017, specifically, approximately $16,000 that was paid to various contractors and sellers for things such as new gutters, paint, cabinets, blinds, and furnishings.

When Barbara sold her home in 2017, she received proceeds of approximately $39,000. Initially, those proceeds were placed in Barbara's separate checking account. But later, Paul and Barbara refinanced the marital residence, and Barbara testified that the proceeds from the sale of her home were used to fund the refinancing. However, Barbara did not adduce evidence that specifically traced the proceeds to the refinancing. Both Paul and Barbara were borrowers on the new mortgage and executed the deed of trust. Barbara testified that she thought the deed of trust was "the deed on the house," and

because it said, "Paul A. Knapp and Barb A. Knapp as husband and wife," she thought that she was a title owner of the marital residence.

Throughout their marriage, Paul and Barbara divided the responsibilities for their living expenses. Barbara paid the bills for the homeowners' association, utilities, internet, lawn care, and the home security company, and Paul paid the mortgage and sometimes the phone bill. When things would break in the marital residence, such as the oven and refrigerator, if Paul could not repair the issue, Barbara would pay for the "fix-it guys." Occasionally, Barbara would contribute to the mortgage payment "if [Paul] had a month that he needed to have extra."

Barbara also testified that she and Paul discussed a maintenance fund for each other to ensure that either of them could remain in the marital residence for as long as they wanted in the event one of them died.

Paul was diagnosed with cancer in 2021. Barbara testified that in 2022, she and Paul seriously discussed what would happen upon his death, and that their prior agreement was reiterated: "That [Barbara] could stay in the house as long as [she] wanted. And [Paul] preferred that [she] stay there. And that when the house was sold, 60 percent would go to his children, and 40 percent would go to [Barbara]." Before his death, Paul did not update the deed to the marital residence or his will.

Barbara's brother testified and recounted that in March 2023, he had a private conversation with Paul. Paul told him that

> "[Barbara] won't have to worry. She's welcome to live in this house for as long as she wants."
>
> . . . "[A]nd besides that, if the house ever sells, [Barbara] knows that she's going to get 40 percent of the proceeds and the rest of the family will get 60 percent."
> . . .
> . . . .
> . . . [Paul] indicated to me that he thought [the remodel] would add 40 percent of the value of that house

at that — you know. And that's kind of how he came up with the numbers 60/40. And that's kind of roughly what he told me.

One of Barbara's friends, who became a friend of Paul, testified that she had a private conversation with Paul in October 2022:

[H]e said, you know, I don't know what's going to go on from here. But everything is all cut and dried. And this is what I want. These are my wishes. And, you know, [Barbara] is supposed to get 40 percent. And Diane's children are supposed to get 60.

. . . .

. . . [Barbara] could live there as long as she wanted to live there. And then it should be divided.

. . . .

. . . I'm not the only one that knew this. [Paul] was very open about his wishes. So, I'm sure everyone knew this.

Barbara's daughter testified that she first had a conversation with Paul about the marital residence within the month or two of Paul and Barbara's marriage in October 2016. She was worried about what would happen to Barbara if something were to happen to Paul, so she asked him. He said, "[Barbara] can live there . . . as long as she wants. When the house is sold, he would like the proceeds to be split 60/40 with [Barbara] getting 40. . . . Because of the — what [Barbara] had put into the remodel of the house." When asked whether this arrangement was something Paul had just thought of, Barbara's daughter stated that it "was a plan." Barbara's daughter also recounted a conversation she had with Paul in December 2022, wherein Paul reiterated the plan.

### DISALLOWANCE OF CLAIMS

Lance testified that he denied Barbara's claim for 40 percent of the proceeds from the sale of the marital residence

[b]ecause that claim ha[d] no basis in law. It's something that they verbally discussed towards the end of his life when they knew that he was not going to survive. The first I ever heard about it was, you know, approximately October or later of 2022. . . .

. . . .

. . . [Paul] was exceedingly brief about it. He just said that when the house was sold that she should get 40 percent of the proceeds and the family should get the rest.

Lance also denied Barbara's alternative claim for reimbursement of the funds she spent on the remodel, "[b]ecause they [were] not in a timely manner. There's no proof of any of this. I was never made aware of that — of this, as the [personal representative] of the estate. This is all something I just came upon after he passed."

## Jointly Titled Property

At trial, Lance argued that despite the premarital agreement's reference to "the personal residence, maintenance fund, and vehicle" and the omitted article 9.4, property needed to be jointly titled to give Barbara or Paul a claim against the other's estate. Lance relied heavily on two facts to show that the marital residence remained Paul's separate property at the time of his death. The first was that in 2018, Paul traded in a truck for a new one, which was jointly titled. Second, a month before Paul's death, he added Barbara as a named depositor of his checking account. Lance implied that Paul knew how to jointly title property to transmute separate property into marital property. Thus, Paul knew he had to, and could have, added Barbara to the deed of the personal residence, but he did not.

## County Court's Order

The court considered whether Barbara was entitled to 40 percent of the proceeds for the sale of the marital residence and a maintenance fund "by virtue" of the parties'

premarital agreement or by a subsequent oral agreement, as Barbara argued.

As for the premarital agreement, the court reasoned that if the premarital agreement was written in clear and unambiguous language, it must be enforced according to its terms. The court found that article XI was unambiguous, but there was "no evidence . . . that [the omission of article 9.4] was not done intentionally or by mistake." The court determined that Barbara was "trying to add terms to the contract that were not even discusse[d] until after the contract was signed." It concluded that there was "no mention of a maintenance fund or a 40/60 in the [premarital agreement]." The court concluded that under the premarital agreement, the marital residence remained Paul's separate property in its entirety because Barbara was never added to the title as a joint tenant with rights of survivorship. Similarly, the court rejected Barbara's contention that she was entitled to a statutory maintenance fund as there was "no mention of a maintenance fund in the contract."

The court then considered whether there was evidence of an oral contract to convey property at death that is outside the effect of the statute of frauds due to partial performance. The court found that the remodel project started in 2015 and was mostly completed before Paul and Barbara married in October 2016. The court further found that Barbara's sale proceeds were not spent on the marital residence until after her home was sold in October 2017 and that Barbara had previously loaned money to Paul for his credit card debt, which he repaid.

Under those facts, the court could not "find that by clear and convincing evidence that at the time the terms of the contract were clear," because the alleged contract was entered into when Barbara sold her home in 2017, 2 years after the remodel project began and was near its completion, and 1 year after her marriage to Paul. The court further could not find that "the

money given to [Paul] was for this project or for a different contract" because of the prior loan from Barbara to Paul for his credit card debt.

Barbara filed a timely appeal, which we moved to our docket on our own motion.[5]

## ASSIGNMENTS OF ERROR

Barbara assigns, reordered, that the county court erred in (1) finding that the premarital agreement was clear and unambiguous for which extrinsic evidence could not be considered to determine the meaning of the missing article 9.4, (2) holding the language of the premarital agreement constituted a waiver by Barbara for a right to proceeds from the marital residence and a maintenance fund, and (3) determining that the undisputed facts were not clear and convincing evidence of an enforceable oral contract that was supported by the performance of the parties.

## STANDARD OF REVIEW

[1] The meaning of a contract is a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below.[6]

[2,3] An action to compel specific performance of an oral contract to devise real property by will is equitable in nature and is reviewed by an appellate court de novo on the record.[7] In a de novo on the record review, an appellate court makes findings independent of the trial court; however, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that

---

[5] See, Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2024); Neb. Ct. R. App. P. § 2-102(C) (rev. 2022).

[6] *White v. White*, 316 Neb. 616, 6 N.W.3d 204 (2024).

[7] *Eggers v. Rittscher*, 247 Neb. 648, 529 N.W.2d 741 (1995).

the trial court heard and observed the witnesses and accepted one version of the facts rather than another.[8]

## ANALYSIS

We first consider Barbara's claims for 40 percent of the proceeds from the sale of the marital residence and a statutory maintenance fund under Paul and Barbara's premarital agreement. We then consider whether Paul and Barbara had an enforceable oral agreement.

### PREMARITAL AGREEMENT

Barbara first argues that the cross-reference in article XI of the premarital agreement to a "non-existent section, creates an inherent ambiguity."[9] Barbara's argument misuses the term "ambiguity."

[4] As we have recognized, an ambiguity is "'[a]n uncertainty of meaning based not on the scope of a word or phrase but on a semantic dichotomy that gives rise to any of two or more quite different but almost equally plausible interpretations.'"[10] Here, Paul and Barbara's premarital agreement does not contain a semantic dichotomy—nor does Barbara argue that it does. In essence, Barbara contends that article 9.4 is ambiguous because article 9.4 does not exist. However, article 9.4 is an omitted term. Neither it nor its cross-reference contains a word or phrase that gives rise to different plausible interpretations.

[5,6] The remedy that Barbara seeks is more properly characterized as reformation. Reformation is based on the premise that the parties had reached an agreement concerning an instrument, but while reducing their agreement to a written form, and as the result of mutual mistake or fraud, some provision or language was omitted from, inserted, or incorrectly

---

[8] See *id.*

[9] Brief for appellant at 21.

[10] *Dirt Road Development v. Hirschman*, 316 Neb. 757, 772, 7 N.W.3d 438, 449 (2024) (quoting Black's Law Dictionary (11th ed. 2019)).

stated in the instrument intended to be an expression of the actual agreement of the parties.[11] In such cases, reformation may be granted to correct an erroneous instrument to express the true intent of the parties to the instrument.[12] However, before reformation of an instrument will be allowed, the party seeking such reformation on a claim of mutual mistake must, by clear and convincing evidence, prove existence of such mistake in reference to the instrument to be reformed.[13]

Here, contrary to Barbara's assertion in her assignment of error, the county court did consider the extrinsic evidence adduced at trial. In its written judgment, the court specifically noted that Barbara "even testified that the 40/60 split was first discussed when she sold her home after the marriage and after the signing of the premarital agreement." We too find Barbara's testimony belies her assertion that article 9.4 was supposed to entitle her to 40 percent of the proceeds of the marital residence. Paul and Barbara could not have intended article 9.4 to provide for Barbara to have 40 percent of the proceeds from the marital residence when they had not yet reached that agreement. Additionally, no evidence was adduced to support a finding that the provision was omitted by mistake. We agree with the county court that reformation of the premarital agreement to supply the contents of the omitted article 9.4 is inappropriate in this case.

As for Barbara's claim to a statutory maintenance fund, she argues that in the absence of article 9.4, the premarital agreement provision that states "[e]xcept for . . . the provisions regarding the personal residence, maintenance fund, and vehicle as set forth in Article 9.4 above" should be read as a

---

[11] *In re Estate of Wiggins*, 314 Neb. 565, 992 N.W.2d 429 (2023); *Jelsma v. Acceptance Ins. Co.*, 233 Neb. 556, 446 N.W.2d 725 (1989); *Haines v. Mensen*, 233 Neb. 543, 446 N.W.2d 716 (1989); *Newton v. Brown*, 222 Neb. 605, 386 N.W.2d 424 (1986).

[12] *In re Estate of Wiggins, supra* note 11; *Jelsma v. Acceptance Ins. Co., supra* note 11.

[13] *Haines v. Mensen, supra* note 11; *Newton v. Brown, supra* note 11.

general exception. She contends that because she released all claims "[e]xcept for" a "maintenance fund," her claim for a statutory maintenance fund should be allowed. We disagree.

The plain language of the agreement does not set forth that the exception is for a maintenance fund, as Barbara contends. Instead, it excepts the "*provisions*" regarding the maintenance fund "*as set forth in Article 9.4.*" (Emphasis supplied.) However, in this case, the provisions of article 9.4 are omitted, and the premarital agreement does not include a provision regarding "*the* . . . maintenance fund." (Emphasis supplied.) Therefore, this language cannot be read to create an exception. Instead, it merely references the exception that it purports is in the omitted article 9.4. Accordingly, under the premarital agreement, Barbara's claim for a statutory maintenance fund was properly disallowed.

## Subsequent Oral Contract

Barbara next argues that the county court erred in failing to find that she and Paul had an oral contract that she would receive 40 percent of the marital residence upon Paul's death in exchange for her contributions to the payment of remodeling costs, her assistance in refinancing the marital residence, and their split of the household expenses. We note that the record is devoid of documentary evidence showing Barbara's financial contribution to the refinance of the marital residence. The documentary evidence shows only that she was a named borrower for the mortgage and executed the deed of trust.

What the record does show is that Barbara "would try to pay half of — or close to half of whatever needed to be paid in the house" and that she paid for some remodel expenses between July 2016 and November 2017. The record also establishes that the parties executed their premarital agreement in September 2016, in which Paul disclosed a debt owed to Barbara for his credit card debt, and that the parties married in October 2016. The record further shows that Barbara sold

her home in October 2017, Barbara signed a deed of trust to refinance the mortgage on the marital residence, and Paul paid the mortgage while Barbara paid other household expenses throughout the marriage. Finally, the record establishes that Paul expressed the "60/40" arrangement around October 2016, October 2017, in 2022, and in 2023. Despite Paul's intention for Barbara to receive 40 percent of the proceeds from the sale of the marital residence, we find that the evidence is insufficient to establish an enforceable contract.

[7] Under Neb. Rev. Stat. § 36-103 (Reissue 2016),

> No estate or interest in land, other than leases for a term of one year from the making thereof, nor any trust or power over or concerning lands, or in any manner relating thereto, shall hereafter be created, granted, assigned, surrendered, or declared, unless by operation of law, or by deed of conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same.

However, property may also be transferred by a last will, even though it is not a deed.[14] Neb. Rev. Stat. § 36-104 (Reissue 2016) provides that "[s]ection 36-103 shall not be construed to affect in any manner the power of a testator in the disposition of his real estate by a last will and testament, nor to prevent any trust from arising or being extinguished by implication or operation of law." Like conveyances by deed, wills must also be in writing.[15]

Undisputedly, Paul did not execute a deed of conveyance in writing that conveyed an interest in the marital residence to Barbara. Nor did Paul execute a superseding last will and testament that devised 40 percent of the proceeds of the marital residence to Barbara.

Instead, Barbara relies upon the statutory exception to the writing requirement for the conveyance of real property found

---

[14] See Neb. Rev. Stat. § 76-203 (Reissue 2018).

[15] See Neb. Rev. Stat. §§ 30-2327 to 30-2329 (Reissue 2016).

in Neb. Rev. Stat. § 36-106 (Reissue 2016): "Nothing contained in sections 36-103 to 36-106 shall be construed to abridge the powers of a court of equity to compel the specific performance of agreements in cases of part performance."

[8] We have long held that in an action for specific performance of an oral agreement with a deceased person to convey land, one trying to enforce such a contract must prove (1) an oral contract the terms of which are clear, satisfactory, and unequivocal and (2) that the thing done constituting performance is such as is referable solely to the contract sought to be enforced, and not such as might be referable to some other or different contract.[16]

Here, we agree with the county court that Barbara has failed to prove the terms of the oral contract and her partial performance thereof. To create a contract, there must be both an offer and an acceptance.[17] Generally, mutuality of obligation is an essential element of every enforceable contract and consists in the obligation on each party to do, or permit something to be done, in consideration of the act or promise of the other.[18]

There is no question that Barbara proved Paul's expressions of an intent that she receive 40 percent of the proceeds from the sale of the marital residence. However, Paul did not execute a subsequent will; thus, his intention alone is not enough. Barbara needed to prove a contract existed. Upon our de novo review of the record in this case, we cannot say that Barbara clearly, satisfactorily, and unequivocally proved the essential element of her obligation under the contract. As a result, she has failed to prove her partial performance.

---

[16] See, *Eggers v. Rittscher, supra* note 7; *In re Estate of Layton*, 212 Neb. 518, 323 N.W.2d 817 (1982); *Busteed v. Sheffield*, 153 Neb. 253, 44 N.W.2d 471 (1950); *Overlander v. Ware*, 102 Neb. 216, 166 N.W. 611 (1918), *supplemented by* 103 Neb. 375, 171 N.W. 901 (1919).

[17] *Morris v. Dall*, 320 Neb. 122, 26 N.W.3d 304 (2025).

[18] *Id*.

This case represents a cautionary tale about the importance of ensuring that your will reflects your testamentary intent.[19] Paul did not revise his will to provide for Barbara to receive 40 percent of his home. If he had done so, the result in this matter would have been different.[20]

## CONCLUSION

Paul and Barbara's premarital agreement is unambiguous, and reformation to supplement an omitted term is inappropriate on the facts of this case. Additionally, the premarital agreement failed to except a maintenance fund from its bar on claims against their respective estates. Furthermore, Barbara has failed to prove the terms of an oral contract and her partial performance thereof by clear, satisfactory, and unequivocal evidence. Disallowance of Barbara's claims was proper, and we affirm the judgment of the county court.

Affirmed.

Miller-Lerman, J., not participating in the decision.

---

[19] See §§ 30-2327 to 30-2329 (requirements that wills must be in writing) and 30-2332 (revocation of will).

[20] See Neb. Rev. Stat. § 30-2401 (Reissue 2016) ("[u]pon the death of a person . . . property devolves to the persons to whom it is devised").